952 N.E.2d 771 (2011)
In re the Matter of Ju.L. and Je.L., Minor Children Alleged to be in Need of Services.
J.L., Appellant-Respondent,
v.
Indiana Department of Child Services, Appellee-Petitioner.
No. 32A01-1010-JC-532.
Court of Appeals of Indiana.
July 6, 2011.
*773 Betty M. Harrington, William O. Harrington, Harrington Law, P.C., Indianapolis, IN, Attorneys for Appellant.
Donna Lewis, DCS Marion County Office, Robert J. Henke, DCS Central Administration, Indianapolis, IN, Attorneys for Appellee.

OPINION
RILEY, Judge.

STATEMENT OF THE CASE
Appellant-Respondent, J.L. (Mother), appeals the trial court's finding that her minor children, Ju.L. and Je.L., are children in needs of services (CHINS).
We affirm.

ISSUES
Mother raises four issues on appeal, which we consolidate and restate as the following two issues:
(1) Whether the trial court erred when it determined that Ju.L. and Je.L. were CHINS pursuant to a statute not cited in the CHINS petition; and
(2) Whether the trial court erred in its findings of fact and conclusions of law.

FACTS AND PROCEDURAL HISTORY
Mother and A.L. (Father) are the parents of two boys, Ju.L. and Je.L., born on March 19, 2004, and February 2, 2006, respectively. During the incidents in question, Mother and Father were in the midst of a contested dissolution proceeding commenced by Mother in May 2008.
After the commencement of the dissolution proceeding, but before July of 2009, the Marion County Division of the Department of Child Services (DCS) received multiple allegations that Father was abusing Ju.L. and Je.L.[1] Between July 2009 *774 and July 2010, DCS received at least twenty-five such reports. The reports alleged among other things that Father had: pinched the boys' penises with his fingers, glass, nail clippers, and hedge clippers; pulled out the boys' hair; poked the boys with needles, safety pins, chop sticks, and a syringe; threatened to pull out the stitches from the boys' circumcisions; put a juice box straw in Ju.L.'s penis; hit the boys with a hammer on various parts of their bodies; tried to give the boys black pills; and bruised Ju.L.'s butt with a melon baller.
DCS investigated many of these reports and interviewed the boys on multiple occasions. Jennifer Daugherty (Daugherty), an investigator with DCS, investigated reports regarding Ju.L. and Je.L. dated July 31, 2009, August 6, 2009, and August 17, 2009. During her investigation, Daugherty interviewed Mother and Father and observed a forensic interview of Ju.L. and Je.L. Based on her observations, Daugherty did not substantiate abuse by Father.
Tracey Pendleton (Pendleton), a Family Case Manager (FCM) with DCS, investigated three reports on December 28, 2009, January 31, 2010, and February 1, 2010. During his investigation, Pendleton did not find any bruises on the boys or any other credible evidence to support the allegations that Father had physically or sexually abused them. Instead, Pendleton substantiated emotional abuse against Mother based on the nature of the allegations and the lack of evidence.
Jamie Walden (Walden), an FCM with DCS, also investigated reports dated March 2, 2010 and March 18, 2010. As part of her investigation, Walden interviewed Mother, Father, and the boys. She did not see any bruises on the boys, and she concluded that the allegations against Father were unsubstantiated.
On February 12, 2010, DCS filed a petition alleging that Ju.L. and Je.L. were CHINS based on Mothers' numerous unsubstantiated allegations. In the CHINS petition, DCS alleged that Mother had
failed to provide the children with a safe and appropriate living environment. The children have been exposed to numerous physical exams and interviews due to [Mother's] repeated claims against [Father]. All of the reports made against Father have been unsubstantiated. Dr. Roberta Hibbard expressed concern regarding the unusual, bizarre complaints of sexual assault and stated that the repeated exams are concerning as they are likely unnecessary and could be harmful to the children. Due to [Mother's] repeated claims against [Father], the lack of evidence to support her allegations, and the continued medical exams and interviews that the children have had to undergo, the coercive intervention of the [c]ourt is necessary to ensure the children's safety and well being.
(Appellant's App. p. 80).
After filing its CHINS petition, DCS decided to investigate all future reports from its office in Hendricks County, Indiana. DCS assigned an ongoing case manager, Angela Baney (Baney), to conduct such investigations. During her work with Ju.L. and Je.L., Baney looked into an allegation that Father had pinched Ju.L.'s penis with nail clippers in the bathroom at Monster Golf. She made one unannounced visit to Father's home, visited Ju.L. at school twice, visited the boys at Mother's home twice, and was present on March 26, 2010, for a forensic interview of Ju.L. As a result of her investigation, she found that the allegations against Father were unsubstantiated.
On April 21, 2010, DCS also assigned Trina Gunn (Gunn), an FCM, to Ju.L. and *775 Je.L. Gunn investigated several reports received in April 2010 and interviewed Ju.L. and Je.L. Ju.L. did not disclose any abuse or neglect the first time Gunn interviewed him. Gunn asked him if he ever received any touches he did not like, and Ju.L. responded that "no, he only gets hugs and kisses from people [] he trusts." (Transcript p. 284). In a second interview on April 21, 2010, Ju.L. "denied anyone ever hurt him other than his [b]rother when they [were] playing." (Tr. p. 287). On May 5, 2010, however, Gunn conducted another interview of Ju.L., in which Ju.L. initially claimed that Father had abused him. Later, Ju.L. admitted that his statements were not true.
During Gunn's investigation of the allegations concerning Ju.L. and Je.L., Mother sent Gunn a DVD video of the boys talking to Mother about Father. In the video, Ju.L. exposed his penis to the camera and made such statements as "I love you mommy[.] I hate you daddy." (Tr. p. 159). Mother also sent several e-mails to Gunn throughout the investigation. In one e-mail dated April 27, 2010, Mother attached pictures of Ju.L. and Je.L. taken on April 21, 2010 and April 25, 2010, that she claimed substantiated Father's abuse. However, DCS did not find marks indicative of abuse when it reviewed the photos. Subsequently, Gunn substantiated emotional abuse as to Mother.
On April 29, 2010, Dr. Jonni Gonso (Dr. Gonso) completed a court-ordered custody evaluation pursuant to Mother and Father's pending dissolution. In her evaluation, Dr. Gonso reviewed 11 DCS complaints up to March 18, 2010, all pleadings in the divorce case, pleadings and orders from the CHINS case, various e-mails and faxes, and documents provided by Mother concerning her divorce and the boys. Dr. Gonso also interviewed Mother, Father, Ju.L. and Je.L.both individually and togetherand evaluated Mother and Father under the Minnesota Multiphasic Personality Inventory II (MMPI-2).[2]
During one interview with Dr. Gonso, Ju.L. told Mother that Father had only touched his penis on accident and that Ju.L. had previously lied about Father poking him in the eye with a needle. Ju.L. also stated that his maternal grandmother had told him to say that Father had poked him. During an interview on January 4, 2010, Ju.L. admitted that Father did not give him black pills and "did [not] pull out [his] stitches."[3] (Tr. pp. 154-55). Then, when Dr. Gonso visited Ju.L. at home, Ju.L. admitted that "really nothing happened in [the bathroom]. Sometimes he clips our nails. There are no chopsticks. It was my grandma's sewing kit. But none of it really happened." (Petitioner's Exh. 8 p. 24). Ju.L. also stated that "Mommy suggested to go to the nurse to tell her it happened." (Petitioner's Exh. 8 p. 24).
Based on the results of the MMPI-2 and her interviews, Dr. Gonso formed the opinion that Mother's profile was indicative of someone with intense chronic anger and that Mother was likely exhibiting alienating behaviors that could eventually cause Ju.L. or Je.L. to refuse contact with Father. She recommended that Father have sole legal custody, that Mother not be permitted to take the children to any kind of medical appointment without Father's attendance or agreement, and that Mother and Father share physical custody on a "2/5 schedule." (Tr. p. 140).
Following the reports made during April of 2010, DCS made an emergency motion *776 for detention of the boys on May 6, 2010, requesting that the boys be placed with Father. On May 12, 2010, the trial court granted the request and ordered Mother's visits with the boys supervised. The last report received by DCS was dated April 29, 2010.
On June 4, June 29, and July 14, 2010, the trial court conducted a factfinding hearing on DCS's petition alleging that Ju.L. and Je.L. were CHINS. At the conclusion of the evidence, the trial court took the matter under advisement and entered its findings of fact and conclusions of law on August 11, 2010. In its findings of fact and conclusions of law, the trial court found that Ju.L. and Je.L. were CHINS because they had been subjected to emotional abuse by Mother. The trial court stated that
Mother ha[d] never wavered in her belief that [Ju.L.] and [Je.L.] were being physically or sexually abused by Father. This despite the fact that [Ju.L.] recanted, admitted to lying, and expressed a desire to be truthful. Additionally, Mother [was] unwilling to consider the possibility that Father [was] not abusing the boys.
(Appellant's App. p. 66). The trial court also found that:
Eight (8) of the reports made from March 1, 2010 until April 29, 2010 were made by someone from Kingsway Christian School. While there was no evidence in the record that Mother ever asked anyone from Kingsway to make a report to DCS or that she ever discussed these allegations with any of the report sources from Kingsway, the fact of the matter is that Mother created an environment at home that encouraged the boys to tell others that Father was abusing them.
(Appellant's App. p. 67).
Mother now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. Standard of Review

In Indiana, a trial court must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. In re N.E. v. IDCS, 919 N.E.2d 102, 105 (Ind.2010). We have recognized that parents have a fundamental right to raise their children without undue influence from the State, but that right is limited by the State's compelling interest in protecting the welfare of children. G.B. v. Dearborn Cnty. Div. of Family and Children, 754 N.E.2d 1027, 1032 (Ind.Ct. App.2001). The CHINS statutes do not require that a trial court wait until a tragedy occurs to intervene. In re A.H., 913 N.E.2d 303, 306 (Ind.Ct.App.2009). Instead, a child is a CHINS when he or she is endangered by parental action or inaction. Id.
Where a party is appealing from a negative or adverse judgment, as here, the standard of review on appeal is the clearly erroneous standard. Fowler v. Perry, 830 N.E.2d 97, 102 (Ind.Ct.App.2005). Under the clearly erroneous standard, we will set aside the trial court's findings and conclusions only when the record contains no facts or inferences supporting them and we are left with a firm conviction that a mistake has been made. Id. In reviewing the record, we will neither reweigh the evidence nor assess the credibility of witnesses, and we will consider only the evidence most favorable to the judgment. Id.

II. The Statutory Grounds for DCS's CHINS Petition

Mother first argues that the trial court erred when it determined that Ju.L. and Je.L. were CHINS pursuant to a statute not cited in the CHINS petition. Indiana Code sections 31-34-1 through -11 list 11 different circumstances under which a *777 child may be adjudicated a child in need of services. The two circumstances at issue in this case are codified in I.C. § 31-34-1-1, "Inability, refusal, or neglect of parent, guardian, or custodian to supply child with necessary food, clothing, shelter, medical care, education, or supervision" (the neglect statute), and I.C. § 31-34-1-2, "Act or omission of parent, guardian, or custodian seriously endangering child's physical or mental health" (the abuse statute).[4] Under the neglect statute, a child is found to be a CHINS if, before the child turns eighteen:
(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education or supervision; and
(2) the child needs care, treatment, or rehabilitation that:
(A) the child is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court.
I.C. § 31-34-1-1. Under the abuse statute, a child is a CHINS if:
(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
(2) the child needs care, treatment or rehabilitation that:
(A) the child is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court....
I.C. § 31-34-1-2.
Mother's primary contention in regards to the abuse and neglect statutes is that DCS did not adequately provide her with notice of the grounds DCS would use to allege that Ju.L. and Je.L. were CHINS. Specifically, in its petition, DCS alleged that:
The children are [CHINS] as defined in I.C. [§] 31-34-1 in that the children's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of a parent, guardian or custodian to supply the children with necessary food, clothing, shelter, medical care, education, or supervision; and the children need care, treatment, or rehabilitation that the children are not receiving and are unlikely to be provided or accepted without the coercive intervention of the [c]ourt....
(Appellant's App. p. 79). In this paragraph, DCS cited I.C. § 31-34-1 generally, which encompasses both the neglect and abuse statutes, but included language mirroring the language of the neglect statute. In contrast, the trial court eventually decided that Ju.L. and Je.L. were CHINS according to the criteria listed in the abuse statute. On appeal, Mother contends that, because the language in the paragraph mirrored the language of the neglect statute, she did not have notice that the trial court would also consider the criteria codified in the abuse statute. In response, DCS notes that it also alleged in paragraph 5(A) of its petition that:
On or about February 11, 2010, [DCS] determined, by its Family Case Manager (FCM) Tracey Pendleton, the children to be children in need of services because [Mother] has failed to provide the children with a safe and appropriate *778 living environment. The children have been exposed to numerous physical exams and interviews due to [Mother's] repeated claims against [Father]. All the reports made against [Father] have been unsubstantiated. Dr. Roberta Hibbard expressed concern regarding the unusual, bizarre complaints of sexual assault and stated that the repeated exams are concerning as they are likely unnecessary and could be harmful to the children. Due to [Mother's] repeated claims against [Father], the lack of evidence to support her allegations, and the continued medical exams and interviews the children have had to undergo, the coercive intervention of the [c]ourt is necessary to ensure the children's safety and well-being.
(Appellant's App. p. 80). According to DCS, this paragraph put Mother on notice that the abuse statute was also a ground for the petition because her acts towards the children were also at issue.
The question of notice in a CHINS petition is governed by Indiana Code section 31-34-9-3, which establishes the requirements for the contents of a CHINS petition. Under I.C. § 31-34-9-3, a CHINS petition must contain both "[a] citation to the provision of juvenile law that gives the juvenile court jurisdiction in the proceeding" and "[a] concise statement of the facts upon which the allegations are based, including the date and location at which the alleged facts occurred." We have interpreted these provisions as necessary to provide a parent, custodian, or guardian with proper notice in a CHINS proceeding so that the parent or guardian may refute the assertions. Maybaum v. Putnam Cnty. Office of Family & Children, 723 N.E.2d 951, 954 (Ind.Ct.App.2000). This is, in part, "because we have long recognized that parental rights have [a] constitutional dimension." Id. However, we have also held that issues not raised by the pleadings may be tried by the express or implied consent of the parties. In re V.C., 867 N.E.2d 167, 178-79 (Ind.Ct.App.2007).
In V.C., we addressed the issue of whether the trial court may adjudicate a child a CHINS on grounds different from those alleged in a CHINS petition. Id. at 177. There, DCS filed a CHINS petition alleging that V.C. was a CHINS because V.C.'s mother had failed to protect her from molestation. Id. The trial court ultimately concluded, however, that V.C. was a CHINS because her mother's acts and omissions had seriously endangered her physical and mental health. Id.
On appeal, we analyzed Ind. Trial Rule 15(B) to determine whether the trial court erred by finding V.C. a CHINS based on different grounds than those alleged in the petition. Id. T.R. 15(B) provides that:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
*779 After reviewing T.R. 15(B), we further elaborated in V.C. that:
The function of the issues, whether formed by the pleadings, pre-trial orders, or contentions of the parties, is to provide a guide for the parties and the court, as they proceed through trial. Either party may demand strict adherence to the issues raised before trial. If the trial court allows introduction of an issue not raised before trial, an objecting party may seek a reasonable continuance in order to prepare to litigate the new issue. However, where the trial ends without objection to the new issue, the evidence actually presented at trial controls. Consequently, neither pleadings, pre-trial orders, nor theories proposed by the parties should frustrate the trier of fact from finding the facts that a preponderance of the evidence permits.

Because fairness compels certain restraints, however, there are limits upon the principle of amending pleadings through implied consent. For example, a party is entitled to some form of notice that an issue that was not pleaded is before the court. Notice can be overt, as where the unpleaded issue is expressly raised prior to or sometime during the trial but before the close of the evidence, or implied, as where the evidence presented at trial is such that a reasonably competent attorney would have recognized that the unpleaded issue was being litigated.

In re V.C., 867 N.E.2d at 178 (internal citations omitted) (emphasis added). When we applied this standard to V.C.'s circumstances, we determined that V.C.'s mother did have adequate implied notice that evidence would be presented that her acts or omissions were endangering V.C.'s physical and mental health. Id. Our reasoning was that V.C.'s father had asked DCS to amend the CHINS petition to allege that V.C. was a CHINS because V.C.'s mother was endangering V.C.'s mental health. Id. This action constituted sufficient notice, even thoughas in the instant caseDCS never amended the petition. Id.
In contrast, Mother here cites Maybaum in support of her arguments that the petition was insufficient to put her on notice. In Maybaum, the Putnam County Office of Family & Children (OFC) alleged that P.M. was a victim of a sex offense at the hands of her father under I.C. § 31-34-1-3, but the trial court ultimately held that P.M. was a CHINS under I.C. § 31-34-1-2 because P.M.'s father had failed to protect her from injury. Maybaum, 723 N.E.2d at 953. On appeal, we determined that "implied consent will not be found if the parties did not know or could not have known that the unpleaded issue was being litigated." Id. at 955. We reviewed the record and determined that the OFC did not "present any specific evidence which would have placed the Maybaums' attorney on notice that it was attempting to show that one of P.M.'s siblings or another person, not P.M.'s father, caused P.M.'s penetrating injury." Id. As a result, we concluded that the trial court erred in holding that P.M. was a CHINS on grounds different than those alleged in the OFC's petition. Id.
Here, we conclude that our decision in V.C. is more applicable to the facts of this case than our decision in Maybaum because DCS did provide Mother with implied notice that her acts and omissions could be grounds for the CHINS proceeding under the abuse statute. In paragraph 5(A) of DCS's petition, DCS stated that
[Mother] has failed to provide the children with a safe and appropriate living environment. The children have been exposed to numerous physical exams and interviews due to [Mother's] repeated *780 claims against [Father]. All the reports made against [Father] have been unsubstantiated. Dr. Roberta Hibbard expressed concern regarding the unusual, bizarre complaints of sexual assault and stated that the repeated exams are concerning as they are likely unnecessary and could be harmful to the children.
(Appellants App. p. 80). This language implicates the language of the abuse statute, which establishes that a child is a CHINS if "the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian." I.C. § 31-34-1-2. Moreover, as we determined in S.W., factual allegations in a CHINS petition may suffice to put a parent on notice that the factual allegations could be at issue in a CHINS proceeding. In re S.W., 920 N.E.2d 783 (Ind.Ct.App. 2010). Therefore, it is not relevant that paragraph 5(A) is a statement of factual allegations rather than the trial court's legal jurisdiction.
Mother contends, though, that V.C. is not applicable because V.C.'s mother did not object at trial to the litigation on the grounds not listed in the CHINS petition, whereas Mother here did object. We do not find this argument persuasive because we find that the controlling factor in V.C. was the issue of notice, not whether the parties objected to the trial court's adjudication of the alternate grounds. Our interpretation prevents parties from pleading ignorance where adequate notice is given. As we stated in V.C., implied notice exists where "a reasonably competent attorney would have recognized that the unpleaded issue was being litigated." In re V.C., 867 N.E.2d at 178 (emphasis added). In further support of this interpretation, we note that in V.C. we did not even address the issue of whether V.C.'s mother had objected when we analyzed whether the trial court had properly decided that V.C. was a CHINS based on a different ground than that listed in the petition. We merely addressed the issue of notice. In sum, we conclude that the DCS provided Mother with adequate notice.

III. The Trial Court's Findings of Fact and Conclusions of Law

Next, Mother argues that the trial court erred in its findings of fact and conclusions of law. When a trial court has entered special findings of fact and law, we apply a two-tiered standard of review on appeal. Schrader v. Porter Cnty. Drainage Bd., 880 N.E.2d 304, 307 (Ind.Ct.App. 2008). First, we determine whether the evidence supports the findings, and, second, whether the findings support the judgment. Id. We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. Id. We neither reweigh the evidence nor reassess the credibility of the witnesses when we review the trial court's findings. Id. Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. Id.
With respect to the trial court's findings of fact and conclusions of law, Mother argues that the trial court erred in concluding that Ju.L. and Je.L. were CHINS because there were no facts in the CHINS petition to support the conclusion that they had been subjected to "numerous exams and interviews." (Appellant's App. p. 66). In her brief, Mother seems to include three sub-arguments within this broader claim. Therefore, we will address each component separately.
First, Mother alleges that
[t]he CHINS petition does not identify the date or location of instances when *781 Mother exposed the [c]hildren to "numerous physical exams." Because the CHINS [p]etition is silent as to what physical examinations DCS is alleging would cause the [c]hildren to be CHINS, the trial court was required to rely on facts not contained in the CHINS [p]etition to conclude that the [c]hildren were CHINS.
(Appellant's Br. pp. 20-1). We interpret this as two arguments: (1) the CHINS petition did not provide Mother with adequate notice because it did not specify the dates or locations of the instances at issue; and (2) the trial court erred because its conclusions of law relied on facts not listed in DCS's CHINS petition.
In regards to the first argument, DCS states in its petition that "Further information is provided in the attached Preliminary Inquiry and Affidavit by the Family Case Manager." (Appellant's App. p. 80). In the Preliminary Inquiry and Affidavit (Preliminary Inquiry) written by FCM Pendleton, DCS does identify specific exams and interviews, along with relevant dates. Among other allegations, it lists that the children were interviewed and examined for bruises, marks, or welts on January 12, 2010 and February 1, 2010. The Preliminary Inquiry also states that the children completed a sexual abuse exam on January 31, 2010. This information satisfies I.C. § 31-34-9-3's requirement that a CHINS petition contain "[a] concise statement of the facts upon which the allegations are based, including the date and location at which the alleged facts occurred." Accordingly, Mother received proper notice that the interviews and examinations of Ju.L. and Je.L. would be at issue during the CHINS action.
Mother's second argument is that the trial court erred because it relied on facts not contained in DCS's petition to determine that the children were CHINS. However, we do not see anywhere in Mother's Brief where she has provided legal precedent for the argument that a trial court may only make conclusions of law based on the facts listed in a CHINS petition. Instead, that argument seemingly contradicts the purpose behind I.C. § 31-34-11-1, which requires a juvenile court to "complete a factfinding hearing not more than sixty (60) days after a petition alleging that a child is in need of services is filed...." We also stated in Maybaum, which Mother cites, that the purpose of providing factual allegations in a CHINS petition is to provide parents with notice of the facts that will be at issue at the factfinding hearing so that the parents can challenge the allegations. Maybaum, 723 N.E.2d at 954 ("Presumably, these provisions were enacted to give the child's parent, guardian, or custodian notice of the allegations and the opportunity to contradict the OFC's case."). In other words, the purpose of a CHINS petition is not to provide the exclusive factual foundation for the trial court's subsequent conclusions of law. Accordingly, we do not find merit in Mother's argument.
Finally, Mother argues that the trial court's findings of fact do not support its conclusion of law that the children are CHINS because the trial court's findings of fact do not justify the conclusion that Mother has caused the children to be exposed to numerous exams and interviews. In support of her argument, Mother compiles sections of the trial court's separate conclusions of law into the following broad conclusion:
DCS has proven by a preponderance of the evidence that Ju.L. and Je.L. are CHINS because they have been subjected to emotional abuse.... Mother has never wavered in her belief that Ju.L. and Je.L. were being physically or sexually abused by Father.... [T]he *782 CHINS [p]etition sets forth in detail that [Mother] has caused the children to be exposed to numerous exams and interviews due to [Mother's] repeated claims against [Father] .... The entirety of the evidence presented by DCS was that Mother is emotionally abusing these children by making unsubstantiated claims of abuse against Father.
(Appellant's Br. p. 20) (emphasis added). Mother's compilation is deceptive, though, because it confuses the trial court's conclusions. This summation makes it seem like the trial court based its decision that Ju.L. and Je.L. were CHINS on the fact that Mother exposed Ju.L. and Je.L. to "numerous exams and interviews." (Appellant's Br. p. 20). Instead, it is apparent within the context of the trial court's unabridged Order that it alluded to the children's exams and interviews merely with respect to the issue of notice. The trial court's conclusion of law No. 9 states that:
The CHINS petitions filed here do not specifically cite Indiana Code § 31-34-1-2 as a basis for the action. However, Paragraph 5(A) of the CHINS [p]etition sets forth in detail that [Mother] had caused the children to be exposed to numerous exams and interviews due to [Mother's] repeated claims against [Father]. As a result, Mother has been on notice since the filing of the CHINS petition of the exact nature of the claim.
(Appellant's App. p. 66) (emphasis added). In contrast, the trial court stated in its conclusion of law No. 8 that:
DCS has proven by a preponderance of the evidence that [Ju.L.] and [Je.L.] are CHINS because they have been subjected to emotional abuse and that [c]ourt intervention is necessary to ensure their care, treatment, or rehabilitation that they are not receiving. Mother has never wavered in her belief that [Ju.L.] and [Je.L.] were being physically or sexually abused by Father. This despite the fact that [Ju.L.] recanted, admitted to lying and expressed a desire to be truthful. Additionally, Mother is unwilling to consider the possibility that Father is not abusing the boys. This despite the fact that the boys alleged that their Father used certain instrumentalities such as clippers, tree trimmers, glass, fingernails, chopsticks, and a hammer, and yet there was nary a single person, except maternal grandmother, who was able to observe physical evidence of the same. Mother continues to believe that Father is abusing the boys.
(Appellant's App. p. 66). As is apparent in these unabridged versions of the trial court's conclusions, the trial court merely referred to the petition's allegations of numerous interviews and exams to support its proposition that Mother had notice that I.C. § 31-34-1-2 could be a grounds for the CHINS proceeding. The trial court's conclusion of law No. 9, then, clarifies that the basis for its CHINS finding is that Mother has never wavered in her belief that the boys are being abused by Father, even though the boys have admitted to lying and there has never been any physical evidence of abusenot solely the evidence of numerous interviews and examinations. Therefore, we will not address Mother's arguments that the examinations were medically necessary and that she did not cause the children to be interviewed.[5] *783 Instead, we determine that the trial court's conclusions of law were not clearly erroneous because there is evidence to support the trial court's conclusion that Mother made repeated allegations of abuse even though the boys admitted they had lied and there was no substantiated physical evidence.

CONCLUSION
Based on the foregoing, we conclude that (1) the trial court did not err when it determined that Ju.L. and Je.L. were CHINS pursuant to a statute not explicitly cited in the CHINS petition; and (2) the trial court did not err in its findings of fact and conclusions of law.
Affirmed.
DARDEN, J., and BARNES, J., concur.
NOTES
[1] The DCS has a special hotline that people who have allegations of abuse can call. Once a person makes an allegation to the hotline, a member of DCS creates a narrative summary of the allegation in a report called a 310 report. Then, an investigative case manager investigates the allegations described in the 310 report and determines whether the allegations are substantiated.
[2] The MMPI-2 is a psychological diagnostic test.
[3] According to Ju.L., Father had given him a vitamin instead of a black pill.
[4] The parties have both acknowledged that I.C. § 31-34-1-1 and I.C § 31-34-1-2 are colloquially referred to as the neglect and abuse statutes, respectively, so we will refer to them as the neglect and abuse statutes throughout the rest of this Opinion.
[5] We will note, however, that the trial court does not specify that the examinations were medical examinations. Mother admits that "the trial court also made a finding that FCM Pendleton `examined' both boys." (Appellant's Br. pp. 21-2). In our opinion, this examination is sufficient to support a conclusion that Mother's allegations led to an examination of the boys. Also, Mother argues that she cannot be held accountable for the times that DCS interviewed Ju.L. and Je.L. because DCS has discretion regarding when it will conduct an interview. This argument is illogical, because the purpose of calling DCS's abuse hotline is to have an allegation of abuse investigated. Mother admits that she called the hotline at least four times, so it is logical that she was anticipating an investigation as a result of those calls.