## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 16 2016, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.C., Minor Child, A Child In Need of Services,

B.T.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

August 16, 2016

Court of Appeals Case No.
49A02-1601-JC-11

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge
The Honorable
Roseanne Ang, Magistrate

Trial Court Cause No.
49D09-1509-JC-2764

Child Advocates, Inc.,

*Co-Appellee-Guardian ad Litem.*

**Kirsch, Judge.**

B.T. ("Mother") appeals the juvenile court's adjudication of her child, J.C. ("Child"), as a Child in Need of Services ("CHINS").[1]  Mother raises the following three restated issues:

> I.  Whether the juvenile court erred by admitting certain evidence, over Mother's objection, and by refusing to admit other evidence offered by Mother;
>
> II.  Whether the juvenile court erred when it continued Child's detention and removal from Mother's care during the proceedings; and
>
> III.  Whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the juvenile court's determination that Child was a CHINS.

---

[1] Child's father does not participate in this appeal.

[2]    We affirm.

## Facts and Procedural History

[3]    Mother is the biological parent of Child, born in 2008, and he is her only child. In 2015, the two of them were living in an apartment in Indianapolis, Indiana. At some time prior to the current case, Mother had been diagnosed with mood swings and paranoia and was prescribed Risperidone. Mother became involved with DCS in 2013 because she was not compliant with her medications and therapy.

[4]    DCS filed a CHINS petition in August 2013, alleging:

> [Mother] has mental health issues that have not been adequately addressed and that seriously hinder her ability to appropriately care for the child. [Mother] has been having delusional thoughts, and she was recently placed under immediate detention. [Mother] reported that she is not currently taking any medication, and she has not taken necessary action to adequately address untreated mental health needs.

*DCS Ex*. 3. Mother admitted that she was unable to properly supervise Child due to untreated mental health issues and that intervention of the court was necessary to ensure his safety and well-being. *DCS Ex*. 2. The juvenile court adjudicated Child a CHINS. The 2013 DCS case was closed in February 2015.

[5]    On September 15, 2015, Mother was at the property management office of her apartment complex, and while there, she complained to the management that her neighbors were loud and disturbing. She told the office that she could hear

sexual activities and music. Ultimately, the management staff called police for Mother concerning her noise complaints, and thereafter, Mother returned to her apartment.

[6] Indianapolis Metropolitan Police Department ("IMPD") Officers Brian Meeks ("Officer Meeks") and David Waterman ("Officer Waterman") responded to a "disturbance" call, or what dispatch indicated had been received as a "harassment report." *Tr*. at 5, 32. Officer Meeks arrived at the scene and was talking to two property management employees when Officer Waterman arrived. Officers Meeks and Waterman knocked on Mother's door and spoke to Mother.

[7] She reported that she was "hearing sounds being pumped into her apartment of a pornographic nature." *Tr*. at 6; *DCS Ex*. 1. She reported that she had moved three times recently and that "the same person has been moving to follow her to continue to pump in the sounds to her apartment." *Tr*. at 6. She told the officers that once she determined who was pumping the noise into her apartment, she would physically harm them "to get them to stop." *Id*. at 30. The officers did not hear any sexual or other noises while they were there. While speaking to the officers, Mother was "very angry" and "yelling loudly in a steady elevated pitch." *Id*. at 10. At one point, Mother looked away and appeared to be speaking to someone who was not there – "an invisible entity" – "mumbling something under her breath about demons." *Id*. at 10-11, 30. The officers were preparing to leave when Mother called Child to the door and asked him if he heard the noises, too. Soon thereafter, Mother "slammed the

door" on the officers. *Id.* at 8. The officers believed Mother was in an "altered mental state" and were concerned about Child's welfare, so they contacted DCS. *Id.* Officer Meeks thereafter conducted a "report search" of police records and found that there were five instances involving Mother calling the police since February 2015. *DCS Ex.* 1. One in July 2015 resulted in Mother being taken into "immediate detention[.]" *Id.*

[8] Later in the day on September 15, Officer Meeks received a call from DCS assessment case manager Amanda Cristina Gonzalez ("FCM Gonzalez"), who asked Officer Meeks to meet her at Mother's home to assist her with making contact with Mother. FCM Gonzalez knocked and identified herself, but Mother refused to open the door. Mother spoke through the door, in an elevated tone. Mother told FCM Gonzalez that Child was safe, and Mother opened the door twice to allow FCM Gonzalez to see Child, but she would not let FCM Gonzalez or the police enter her apartment. Mother "instructed" Child to tell FCM Gonzalez that he was safe. *Id.* at 48. During the conversations with Mother through the closed door, FCM Gonzalez heard Mother make what FCM Gonzalez deemed to be unusual comments, some of a religious nature, such as "In Jesus name get off my doorstep" and state that she was a God-fearing and "good Christian woman," and she heard Mother state something about "a demon." *Id.* at 50, 53.

[9] After about forty-five minutes, Mother opened the door. She allowed FCM Gonzalez into her home but insisted that the police not enter. She attempted to close the door on the officers, but they pushed the door open and made "a

forced entry" into her apartment. *Id*. at 40. Mother backed away from the door, and Officer Meeks placed Mother in handcuffs because he believed she was still in an "altered mental state" and that there was going to be a struggle. *Id*. at 17. Thereafter, Mother told FCM Gonzalez that she was a diagnosed paranoid schizophrenic and had been prescribed Risperidone, 1 mg taken at night before bed. Mother also said that she "often" takes 2 mg because that is what they gave her at the hospital. *DCS Ex*. 1.

[10] FCM Gonzalez was concerned that Mother's medication was not controlling her mental health issues and felt Mother was in a "delusional state of mind." *Tr*. at 54. Mother was transported to St. Vincent Hospital ("the Hospital") for an assessment, and Child was removed from Mother's care.

[11] Two days later, on September 17, 2015, DCS filed a CHINS petition, asserting that Mother's mental health issues were affecting her ability to safely parent Child. "The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision" *Appellant's App*. at 27-29. Specifically, the Petition alleged:

> 1. [Mother] has failed to provide the child a safe and secure home free from untreated mental health concerns.
>
> 2. [Mother] was taken to [Hospital] due to acting erratic and hearing voices and pornographic noises, leaving the child without a caregiver.

3. [Mother] is diagnosed with schizophrenia and is not properly taking her medication.

4. [Mother's] mental health concerns limit her ability to safely parent the child.

5. [Father] is the alleged father of [Child] and his whereabouts are currently unknown. [Father] is unable to ensure his child's safety while in [Mother's] care.

6. The family has DCS history to include a prior CHINS case.

7. Due to the foregoing, the coercive intervention of the court is necessary to ensure the child's safety and well being.

*Id.* at 28.

[12] The initial/detention hearing was held on September 17, 2015. Mother appeared in person and with counsel, and Mother requested that Child be returned to her care. The juvenile court denied Mother's request and continued Child's placement with Maternal Grandmother and appointed a guardian ad litem ("the GAL"). The juvenile court also directed DCS to verify Child was enrolled in a valid educational program.[2] *Id.* at 42.

[13] During the course of the CHINS proceedings, DCS permanency caseworker Vardella Paige ("FCM Paige") met with Mother to assess the family's needs

---

[2] Prior to removal, Mother had been homeschooling Child.

and to consult with her about counseling and mental health services. FCM Paige referred Mother and Child to Cummins Mental Health ("Cummins") for assessments and offered to assist Mother with her referral. Mother told FCM Paige that she would handle her own referral for services. *Tr.* at 77. FCM Paige recommended home-based therapy for Child and a home-based case manager to ensure that Mother took her medications, as well as to ensure that Mother was equipped with appropriate parenting techniques.

[14] In September, Mother appeared in person and by counsel for a pretrial hearing. Mother's mother, Lisa Coach ("Grandmother"), also attended the hearing. Mother requested that Child be returned to her care and testified that she was compliant with her treatment and medications. DCS and the GAL opposed her request, with the GAL stating that Mother may take "double doses" of her medication. *Appellant's App.* at 55-56. The juvenile court continued the placement of Child in relative care, but authorized the return of Child to Mother upon positive recommendations of DCS, the GAL, and service providers. *Id.* at 56-57. At two subsequent detention hearings, the juvenile court continued Child in relative care.

[15] A fact-finding hearing occurred on October 14, 2015. FCM Gonzalez testified that, upon receiving the September 15 report from law enforcement, DCS determined that the matter warranted "immediate attention" due to Mother's reported "delusional" state of mind and because Mother was Child's only caregiver. *Tr.* at 46. The case was assigned to FCM Gonzalez, who, pursuant to policy for "one-hour response time" cases, contacted law enforcement to

request their presence when she made contact with Mother. *Id.* FCM Gonzalez testified that she arrived, knocked, identified herself, and explained that she was there to check on Child's safety, but Mother was unwilling to open the door and speak directly with her for approximately thirty to forty-five minutes. FCM Gonzalez could hear Mother "insist[ing]" to Child that he tell FCM Gonzalez that he felt safe in the home. *Id.* at 51. Mother opened the door slightly on two occasions, one of which was to show Child to FCM Gonzalez. Mother "instructed" Child to say he was safe. *Id.* at 48.

[16] Eventually, Mother opened the door a third time, and police pushed the door and handcuffed Mother. *Id.* at 49. FCM Gonzalez testified that Mother's demeanor changed, and she became calmer. As they talked, FCM Gonzalez observed Mother appear to be speaking to someone over her shoulder, although no one was there. Mother told FCM Gonzalez that the pornographic sounds had been going on "for an extended period of time" and that she felt the sounds had followed her to their current home. *Id.* at 53. FCM Gonzalez also testified that, while at Mother's apartment on September 15, she had examined Mother's Risperidone bottle, and at that time, it contained approximately seventeen pills and had been due for a refill in July 2015. Based on the pill count, FCM Gonzalez determined that Mother already should have refilled her prescription. *Id.* at 59. FCM Gonzalez opined that Mother would benefit from a mental health evaluation to ensure she was receiving and participating in recommended forms of treatment to manage her diagnosed issues. She also recommended having someone in the home to monitor Mother for a period of

time. FCM Gonzalez testified that in her opinion coercive intervention of the court was necessary. *Id.*

[17] FCM Paige also testified at the fact-finding hearing. Although FCM Paige had referred Mother for services at Cummins for an assessment and had recommended home-based therapy for Child, those services for Child and Mother had not yet started. *Id.* at 77-78. FCM Paige also testified that she believed Mother should receive home-based case management services "to assist with making sure that [Mother] is taking her medication" and "parenting techniques are being used and utilized." *Id.* at 81-82. FCM Paige testified that she believed those services were needed and that, if those services were not implemented, she would have continued concerns about Child's well-being. *Id.* FCM Paige further testified that she believed coercive intervention of the court was necessary to get Mother to obtain the services for Child. *Id.* at 87. FCM Paige acknowledged at the hearing that she was not present at Mother's apartment on September 15, 2015. She also acknowledged that according to DCS reports, the home was clean and Child was properly dressed and had no visible injuries. She did not dispute that, as Mother claimed, Mother was released from the Stress Center that same night.

[18] Officers Meeks and Waterman testified at the hearing. Officer Waterman testified that Mother reported "somebody or people [were] following her around the apartment complex and moving in above her and playing loud sexual noises through the vents into her apartment[,]" and that she "also mentioned something about demons." *Id.* at 34. Officer Meeks testified

likewise. During Officer Meeks's testimony, DCS offered into evidence the police report that he had prepared of the September 15 incident. Mother's counsel objected to the report as hearsay, but the juvenile court admitted the report over her objection. DCS also offered the 2013 CHINS petition and order, to which Mother objected on relevance grounds and that, additionally, the documents were prejudicial. The juvenile court admitted the documents over Mother's objections.

[19]  Mother also testified at the hearing, stating that she had been diagnosed "with . . . paranoia" and takes Risperidone. *Id*. at 101. She denied having reported that she did not need her medications, and she testified that she had been to the doctor recently, takes the Risperidone "consistently," and also maintains her prescription refills. *Id*. at 115. As to the 2013 CHINS proceedings, when asked if she had admitted that her son was in need of services, she replied, "I had to[,]" and she acknowledged that "back then" she was not taking her medication. *Id*. at 102.

[20]  Mother testified that, on September 15, she was taken by a police van to the Hospital, where she was assessed and monitored, then released the same night, but escorted directly to the Stress Center. Mother testified that she spoke to a therapist there, and after some monitoring, the therapist called Mother a cab and sent her home. Mother moved to admit into evidence the certified copies of her medical records from the Hospital and the Stress Center. DCS objected, arguing that, while the certification might authenticate the documents, each

contained hearsay and should not be admitted. The juvenile court excluded the records.

[21] On cross-examination, DCS sought to ask Mother about her contact with law enforcement occurring after the prior CHINS action closed and before the September 15, 2015 incident. Mother objected on relevance grounds, which the juvenile court overruled. During DCS's examination, Mother was questioned about, and denied, calling police from her car to report being followed and also reporting to police that she had been surrounded and harassed at church. Mother acknowledged that, during the relevant time period, police had contacted her with regard to a report in which a woman complained to police that Mother had called her twenty-five times or more and that Mother had told the woman that she had received a message from God that she would have to kill the woman; Mother acknowledged that police had contacted her to discuss the matter, but she denied having made the multiple calls to the woman or threatening her. Upon further cross-examination, Mother denied that she cut a hole in the wall between her apartment and the one next door, but she admitted to talking to police about the matter.

[22] At the time of the fact-finding hearing, Child was in the care of Grandmother, with Mother having daily supervised visitation with Child. At the conclusion of the hearing, Mother requested that Child be placed back in her care. DCS and the GAL opposed her request. However, due to Grandmother's 3:00 p.m. to 12:00 a.m. work schedule, which required Child to be taken to daycare and then an aunt's home until Grandmother came to get him after work, the parties

discussed an alternative plan to avoid shuffling Child at that late hour. Following the hearing, the juvenile court issued an order that continued removal of Child and his placement in relative care. The order also authorized Mother to provide childcare to Child at Grandmother's home during Grandmother's work hours, but directed that Mother could not leave the home with Child and required that home-based services be in place prior to this occurring. *Appellant's App*. at 67. DCS was to "notify the court if there is any concern regarding the safety and wellbeing of the child." *Id*.

[23] On November 5, 2015, DCS filed an emergency motion for change in visitation from unsupervised to supervised and for an authorization for a change in placement to another relative, attaching to the motion an affidavit prepared by a family case manager. The affidavit averred that DCS received notification that Mother had contacted police on November 1, that police had transported Mother to a hospital for psychiatric evaluation, and that DCS had been informed that Grandmother "no longer felt comfortable allowing [Mother] to be in her home." *Appellant's App*. at 72. The emergency motion asserted that DCS had concerns "about whether [Mother] is properly taking her psychiatric medications and about the safety of [Child] while in her care." *Id*. at 70. DCS requested that Child be placed in other relative care during Grandmother's work hours and that Mother's parenting time be supervised. *Id*. at 71. The juvenile court granted DCS's request that same day. A week later, Mother filed a motion in opposition to DCS's motion, which the court set for hearing.

On December 1, the juvenile court entered its order adjudicating Child a CHINS. *Id*. at 90-91. It also heard and denied Mother's motion opposing change of placement, denying Mother's request to have Child placed with her and ordering that her visitation remain supervised. The matter proceeded to disposition on December 15, 2015, after which the juvenile court issued a parental participation order and ordered Mother to participate in home-based case management and to continue her individual therapy and medication management with Cummins. *Id*. at 105. Mother now appeals.

## Discussion and Decision

## I. Admission and Exclusion of Evidence

Mother asserts that the juvenile court abused its discretion when it (1) admitted the IMPD police report concerning the September 15 incident and the 2013 CHINS petition and adjudication, and (2) excluded her medical records from the Hospital and the Stress Center. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re S.W.,* 920 N.E.2d 783, 788 (Ind. Ct. App. 2010). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. Ind. Evidence Rule 103(a). "[E]rrors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.'" *In re Des.B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014). To determine whether the admission of evidence affected a party's substantial rights, we

assess the probable impact of the evidence upon the finder of fact. *Id.* Additionally, any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. *In re S.W.,* 920 N.E.2d at 788.

### A. Admission of DCS Evidence

Here, when DCS offered Officer Meeks's police report into evidence, Mother objected on the basis that it contained hearsay, specifically arguing that the report referred to statements made by Mother while police were at her apartment. "It talks about [Mother] yelling and saying different things" to prove the truth of the matter that Mother "was in some kind of altered state." *Tr.* at 19. The juvenile court, observing that the hearsay being objected to was Mother's own statements, overruled the objection and admitted the report into evidence. We find no error in that decision.

Indiana Evidence Rule 801(c) provides that hearsay is a statement that is not made by the declarant while testifying at trial or hearing that is offered into evidence to prove the truth of the matter asserted. Indiana Evidence Rule 801(d) identifies statements that are not hearsay, including an opposing party's statement that is offered against the opposing party. Evid. R. 801(d)(2)(A). Here, Mother's statements to police and those made by her in their presence were not hearsay, as they were statements made by Mother and offered against Mother at her trial.

[28] With regard to the 2013 CHINS documents, Mother objected when the CHINS petition and her admission to the allegations were offered into evidence. Mother asserted that those documents were not relevant to the present matter, *i.e.* whether she admitted that "back then" her son was in need of services was not relevant to the current matter, and further, were highly prejudicial and inflammatory. *Tr.* at 95. DCS responded that the evidence was relevant because both the old case and the current one concern Mother's "serious mental health issues," and the 2013 documents showed "a continuity of this problem or pattern in terms of maintaining her mental illness and thus protection and safety for [Child]." *Id.* at 95-96. The juvenile court admitted the documents over her objections.

[29] On appeal, Mother asserts such evidence was not relevant and was prejudicial. Mother argues that what happened in 2013 had no relevance to the present matter, given that in 2013 she admitted to not properly taking her medication, but in the present case, "even evidence offered by [DCS] indicated that Mother consistently took her medications as prescribed by her doctor." *Appellant's Br.* at 39. Mother's representation that DCS's evidence "indicated that Mother consistently took her medications" is inaccurate. Mother's citations to portions of the transcript are references to FCM Gonzalez's testimony at the fact-finding hearing stating that Mother *had told her* that she was taking her medication. FCM Gonzalez never testified that Mother was taking her medications as prescribed. To the contrary, FCM Gonzalez testified that she was concerned

Mother needed to be evaluated and monitored to be sure she was taking her medication properly and consistently.

[30]     Indiana Code section 31-34-12-5 provides:

> Evidence that a prior or subsequent act or omission by a parent, guardian, or custodian injured or neglected a child is admissible in proceedings alleging that a child is a child in need of services to show the following:
>
> (1) Intent, guilty knowledge, the absence of mistake or accident, identification, the existence of a common scheme or plan, or other similar purposes.
>
> (2) A likelihood that the act or omission of the parent, guardian, or custodian is responsible for the child's current injury or condition.

As DCS points out, "[a] parent's character is at issue in CHINS proceedings." *Appellee's Br*. at 21. Indiana courts "have held that evidence of a parent's prior involvement with [DCS], . . . including CHINS petitions filed on behalf of [the parent's] children, was admissible in a CHINS proceeding as character evidence under Indiana Evidence Rule 405."[3] *Matter of D.G.,* 702 N.E.2d 777, 779 (Ind. Ct. App. 1998). Here, Mother has failed to meet her burden to show that admission of the evidence prejudiced her substantial rights, and thus she has

---

[3] Indiana Evidence Rule 405(b) states: When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

failed to establish that the juvenile court abused its discretion when it admitted the 2013 CHINS documents.

### B. Exclusion of Mother's Evidence

Mother next asserts that the juvenile court should have admitted her certified medical records from the Hospital and the Stress Center because they qualified under the business records exception to the hearsay rule. At the fact-finding hearing, during Mother's testimony, Mother's counsel offered the certified Stress Center records as Exhibit A and the certified Hospital records as Exhibit B. Each exhibit included an affidavit from the custodian of records, stating that the records were true reproductions, made and kept in the regular course of business. *Appellant's Exs.* A and B. DCS objected on the basis that the records constituted hearsay. Mother argued that the records qualified for admission under the business records exception, but DCS maintained that the "certification authenticates the records, but does not make the contents admissible, they are hearsay." *Tr.* at 120. The juvenile court excluded the records. Mother made an offer of proof, indicating that the records would show that Mother suffered from paranoia, but that she did not present a danger to herself or others and was released. *Id.* at 127-29.

Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted, and it is inadmissible unless it falls under a recognized exception. Evid. R. 801(c), 802. One such exception exists for records that satisfy the requirements the business records exception, codified in Indiana

Rule of Evidence 803(6), which provides that the following are not excluded even though the declarant is available as a witness:

> **Records of Regularly Conducted Business Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. The term "business" as used in this Rule includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

"In essence, the basis for the business records exception is that reliability is assured because the maker of the record relies on the record in the ordinary course of business activities." *In re Termination of Parent-Child Relationship of E.T.,* 808 N.E.2d 639, 643 (Ind. 2004).

[33] On appeal, Mother contends the records were admissible under the business records exception and that the denial of admission prejudiced her "because the documents contained medical information, events, conditions, opinions, and/or diagnoses, made on September 15, 2015, about the state of Mother's mental health condition made by mental health providers[.]" *Appellant's Br.* at 40. Our Supreme Court has stated, "Although Rule 803(6) accommodates the inclusion of 'opinions' in business records our courts have long recognized, at

least in the context of medical or hospital records, that the expertise of the opinion giver must be established." *In re E.T.*, 808 N.E.2d at 644 (citing *Fendley v. Ford,* 458 N.E.2d 1167, 1171 n.3 (Ind. Ct. App. 1984) ("Expressions of opinion within medical or hospital records historically have not been admissible under the business records exception because their accuracy cannot be evaluated without the safeguard of cross-examination of the person offering the opinion.")).

[34] Assuming without deciding that the juvenile court abused its discretion by not admitting the records of the Hospital and the Stress Center, Mother has not shown that she was prejudiced. Mother testified that she was admitted and released from the Hospital the same day and was escorted to the Stress Center, where she met with a therapist, who after conversing and monitoring Mother, called a taxicab for Mother and sent her home. The excluded records were cumulative of Mother's testimony, and she has failed to show that her substantial rights were affected by the exclusion of the offered evidence.

## II. Detention

[35] Mother contends that the juvenile court "inappropriately detained" Child in violation of the Indiana Code and Child's constitutional rights. *Appellant's Br.* at 35. Here, Mother requested Child's return to her care at the September 17, 2015 initial hearing, at a September 29, 2015 pre-trial hearing, and at the October 14, 2015 fact-finding hearing. Mother asserts that "each time, the trial court continued the removal and detention of [Child]" by a "template order," which stated that it was in Child's best interests, that the removal was to protect

him, and that it would be contrary to his health and welfare to return to Mother, and that reasonable efforts had been offered to prevent the need for removal. *Id*. at 36. On appeal, she argues that "[w]hile the trial court used the necessary language as required by Indiana Code," it did not include facts to support its findings. *Id*. at 37.

[36] Initially, we observe that Mother did not challenge the detention below. Although she asked that care of Child be returned to her, she did not otherwise allege or seek redress of what she now claims was error. The failure to raise claimed error to the trial court results in waiver. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003) (pursuant to general rule that issue cannot be raised for first time on appeal, procedural due process claim in CHINS case waived when raised for first time on appeal). Furthermore, although Mother alleges violation of "constitutional rights," she makes no argument in that regard, and has waived any constitutional challenge for failure to make a cogent argument or provide citation to authority. Ind. Appellate Rule 46(A)(8). Likewise, although Mother asserts that the juvenile court's interim detention findings were improper because they contained the necessary statutory language but failed to include supporting facts, she provides no supporting authority for her position that inclusion of such factual support is necessary, and therefore, she has waived this argument as well. *Id*.

[37] Waiver notwithstanding, we find no error in the juvenile court's decision to continue Child's removal from Mother's care. Mother argues, among other things, that she was released from the Hospital and from the Stress Center,

which made her available to take care of Child, and, further, "Mother was taking her medication as prescribed, . . . [and] was seeking treatment and therapy as recommended by her doctor[.]" *Appellant's Br.* at 37. However, the fact that Mother testified to consistently and properly taking her prescribed medication does not make it so. The FCM and police officers testified to Mother murmuring about demons and referencing Jesus's name and "calling on higher powers[.]" *Tr.* at 15. As of the time of the fact-finding hearing, the record reflects that both DCS and the GAL remained opposed to returning Child to Mother's sole and unsupervised care unless and until home-based services were implemented, in order to provide that Child had an outlet to address issues and to ensure that Mother was receiving proper care to manage her mental health issues and, further, was taking whatever medication was prescribed. We find no error in the juvenile court's continued detention of Child and his placement in relative care.

## III. Sufficiency of the Evidence

[38] Mother contends that the juvenile court's adjudication of Child as CHINS is clearly erroneous. We have recognized that parents have a fundamental right to raise their children without undue influence from the State, but that right is limited by the State's compelling interest in protecting the welfare of children. *In re Ju.L.*, 952 N.E.2d 771, 776 (Ind. Ct. App. 2011). Indiana Code Section 31-34-1-1 provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or

neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. "A CHINS adjudication focuses on the condition of the child." *In re Des.B*, 2 N.E.3d at 835. A CHINS adjudication does not establish culpability on the part of a particular parent; rather, the purpose of a CHINS adjudication is to protect children, not punish parents. *Id.* The CHINS statutes do not require that a trial court wait until a tragedy occurs to intervene. *In re Ju.L.*, 952 N.E.2d at 776.

[39] The DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. Ind. Code § 31-34-12-3; *In re Ju.L.*, 952 N.E.2d at 776. When reviewing the sufficiency of the evidence to support a CHINS adjudication, we consider only the evidence favorable to the judgment and the reasonable inferences raised by that evidence. *In re Des.B*, 2 N.E.3d at 836. This court will not reweigh evidence or judge witnesses' credibility. *Id.*

[40] Where, as here, a party is appealing from a negative or adverse judgment, the standard of review on appeal is the clearly erroneous standard. *In re Ju.L.*, 952 N.E.2d at 776. Under the clearly erroneous standard, we will set aside the trial court's findings and conclusions only when the record contains no facts or inferences supporting them, and we are left with a firm conviction that a mistake has been made. *Id*.

### *a. Findings of Fact*

[41] Mother contends that the evidence does not support several of the juvenile court's findings, namely Findings 1, 7, and 9. Finding No. 1 states Child's date of birth, which Mother claims is "not supported by appropriate evidence." *Appellant's Br*. at 25. Child's date of birth appeared in the 2013 CHINS petition, which we have already found was properly admitted. Furthermore, Mother included in her Appendix the CHINS petition that was the basis of DCS's current involvement, which contains Child's date of birth. *Appellant's App*. at 27. Thus, we reject Mother's claim that Finding 1 was not supported by the evidence.

[42] Finding No. 7 states: "During this encounter, [Mother] was observed whispering a comment about demons and appeared to be looking at and speaking to someone who was not there." *Id*. at 90. Mother asserts that this finding was "not supported by the evidence as a whole." *Appellant's Br*. at 26. Again, we reject Mother's claim and find that there was sufficient evidence to support this finding, as the two IMPD officers as well as FCM Gonzalez testified to hearing Mother murmur about "demons" and appear to speak to someone over her shoulder, although no one was there. *Tr*. at 11, 30, 34, 50. Mother's actual argument appears to be, not that there was no evidence in support of Finding No. 7, but rather that "[w]hat's missing from this finding is the fact that Mother was relying upon her faith and engaging in the power of prayer," noting that [t]here are over fifty vers[e]s in . . . the Bible which specifically mention calling upon God and Jesus" and urging that Mother's

prayer should be considered "a call to summon strength from within and from her Savior." *Id*. at 26-27. We will not reweigh the evidence on appeal, and we find the evidence presented supported Finding No. 7.

[43] Finding No. 9 states: "On September 15, 2015, [Mother] informed FCM Gonzalez that she was taking this medication as prescribed. [Mother] also informed FCM Gonzalez that she often takes 2 mg of Risperidone because that is what they gave her at the hospital" *Appellant's App*. at 90. As with Finding No. 1, Mother claims Finding No. 9 is not supported by "appropriate evidence," because the juvenile court relied on "inappropriately admitted evidence," namely Officer Meeks's police report, where he reports hearing Mother tell FCM Gonzalez that she sometimes takes 2 mg of her medicine. Having found that the police report was properly admitted into evidence, we find that Finding No. 9 was supported by sufficient evidence.

### b. *Conclusions of Law*

[44] Mother argues that Conclusion Nos. 12 and 13 are not supported by appropriate evidence or findings. They state, respectively:

> [Child's] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. On September 15, 2015, [Mother] was in an altered state of mind while being the sole caregiver for [Child] and admitted to often taking more medication than has been prescribed.

[Child] needs care, treatment, or rehabilitation that he is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. The [DCS] and this Court's involvement are necessary to provide for [Child] until such time frame as [Mother] is able to achieve stability and maintain the mental health treatment she requires.

*Appellant's App.* at 91.

[45] Mother urges that (1) "[b]y all accounts, [she] provided appropriate food, clothing, shelter, and education for [Child]," (2) there was no evidence regarding "the need [for] or absence of medical care for [Child]," and (3) she had only "very brief unavailability" to parent Child while she was at the Hospital and the Stress Center on September 15, 2015. *Appellant's Br.* at 30, 31. The core issue, however, is Mother's mental health and her treatment of it, and with regard to that Mother maintains: (1) "The uncontroverted evidence [] indicates Mother maintained her mental health treatment and medications prior to and during [DCS]'s involvement[,]" and (2) "She was able to address her own mental health needs without the assistance of [DCS] and indicated her willingness to continue doing so without their help." *Id.* at 31. The evidence does not support Mother's claims.

[46] Contrary to Mother's claim of "uncontroverted evidence" showing that she was maintaining her mental health treatment, the evidence was that Officers Meeks and Waterman heard Mother "calling to higher powers," murmur about "demons," and allege that person or persons were following her to multiple residences and piping pornographic noises into her apartment. *Tr.* at 11, 15, 30,

34. FCM Gonzalez similarly heard Mother speak over her shoulder, although no one was there, and "instruct" Child to tell FCM that he was safe and fine. *Id.* at 48. Officer Meeks, in conducting a search of police reports, found that Mother in the span of six months or so had contacted police at least five times about being followed, harassed, or hearing loud noises. Officer Meeks heard Mother report to FCM Gonzalez that she sometimes took a double dose of her prescribed medication. FCM Gonzalez and the GAL advised the juvenile court that they did not recommend that Child be returned to Mother until she completed assessment and home-based case management was put into place both for Child and for Mother. FCM Paige testified that she was concerned about the home being unstable, given the repeated police calls, and she recommended a home-based therapist and that Mother continue medication management with Cummins. In November 2015, the juvenile court changed Mother's parenting time with Child from unsupervised to supervised after DCS received a report that Mother had contacted police and had been taken for a psychiatric evaluation. *Appellant's App.* at 70-71, 94. On appeal, DCS summarizes the situation:

> DCS does not dispute Mother's willingness to parent Child[;] the question was whether she could do so safely. Here the trial court concluded that she could not without some form of coercive intervention. The record supports that.

*Appellee's Br.* at 42.

[47] We agree. The record supports the juvenile court's conclusion that Child's physical or mental condition was seriously impaired or seriously endangered as a result of Mother's inability, refusal, or neglect to supply the child with necessary food, clothing, shelter, medical care, education, or supervision and its conclusion that Child needed care, treatment, or rehabilitation that he was not receiving and was unlikely to be provided or accepted without the coercive intervention of the court. Mother has failed to meet her burden to show that the CHINS adjudication was clearly erroneous.[4]

[48] Affirmed.

[49] Riley, J., and Pyle, J., concur.

---

[4] Mother notes that DCS could have pursued "other options," such an "informal adjustment" pursuant to Indiana Code section 31-34-8-1, under which she would agree with DCS to participate in services while being monitored. *Appellant's Br.* at 35. Mother does not indicate whether she raised or sought this option with the juvenile court, and we decline to address it on appeal.