## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 09 2016, 10:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy's Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of  K.C., C.M., Ki.C., & K.M.,

(Minor Chidren),

and,

A.C., (Mother) & R.L.M., (Father),

*Appellants-Respondents,*

November 9, 2016

Court of Appeals Case No. 60A05-1603-JC-488

Appeal from the Owen Circuit Court

The Honorable Kelsey B. Hanlon, Judge

Trial Court Cause No.
60C02-1511-JC-266
60C02-1511-JC-267
60C02-1511-JC-268
60C02-1511-JC-269

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

R.M. ("Father") and A.C. ("Mother") appeal the trial court's adjudication that their four children are children in need of services ("CHINS"). We affirm.

# Issue

The combined and restated issue before us is whether there is sufficient evidence in the record to support the CHINS adjudication.

# Facts

Mother and Father are the parents of four children, who, in November 2015, were between four months and six years old. In that month, the Owen County office of the Department of Child Services ("DCS") received a report that Father was accused of killing an unidentified man. Additionally, DCS received reports claiming that the children were neglected as a result of their parents'

drug use and domestic violence in the home.[1]  On November 24, 2015, DCS caseworker Charlotte Church interviewed the parents at the maternal grandmother's home, where DCS had learned the parents were located with their children at that time, although they were not living there.

[4]    Church spoke with Mother, who told Church that she and Father had been in an "altercation" that resulted in a mirror being broken in the home where they lived with the children.  Tr. p. 35.  Mother did not provide Church with any details as to this "altercation," nor did Church notice that Mother had any injuries.  Father interrupted Church's attempts to speak with Mother alone. Father also appeared to Church to be "frustrated," and his demeanor fluctuated between calm and agitated.  *Id.*  Mother later insisted that no domestic violence occurred in the home, and no domestic battery charges have been filed against Father.

[5]    Both parents refused Church's offer at that time to take a drug screen but admitted to taking Suboxone, which is used medically to treat opioid addiction. Church noted that Mother had a prescription bottle for Suboxone from July 2015 and that Father had a current prescription for Suboxone.  The parents did not permit Church to observe the family home at that time.  However, Church

---

[1] DCS also apparently received information that one of the children had been the victim of sexual abuse. This claim was not included in the CHINS petitions, nor was any evidence ever presented to support this allegation.

did so on another occasion, and she had no concerns regarding cleanliness, food, bedding, or anything else regarding the physical condition of the home.

On November 25, 2015, DCS removed the four children from Mother and Father's care and filed identical CHINS petitions as to each of the children. The children were placed in the care of the maternal grandmother. During the approximately two months between the filing of the petitions and the holding of fact-finding hearings, Mother and Father voluntarily and routinely submitted to drug screens and never tested positive for any improper substances. Both parents did often test positive for Suboxone, although not always. Also, after the CHINS petition was filed and before the first fact-finding hearing, DCS referred both parents to either Hamilton Center or Cummins for a mental health evaluation and treatment. Father first sought treatment services from Hamilton Center but they refused to provide services to him for reasons that are not specified in the record. Father then went to Cummins, which told Father that they could not meet his psychological needs. Father then sought and received treatment from a facility called Centerstone, which provides substance abuse and individual counseling. Father may have sustained a head injury at some point in the past, and DCS believes he may need a neuro-psychological examination. There is no evidence as to any particular mental illness from which Father suffers.

The trial court conducted fact-finding hearings on January 15 and 26, 2016. Church testified that many people are frightened of Father's temper. Maternal grandmother did not like supervising visits because of her fear of Father, which

resulted in some visitations being missed and eventually changed to visitation at the DCS office rather than maternal grandmother's home. Otherwise, however, Mother and Father consistently visited with the children.

[8] Evidence also was presented that, after the children's removal, they were all taken for a medical checkup. The two youngest children were not current on their recommended vaccinations, but the older two were. A physician's assistant at the medical office expressed concern that none of the children were regularly brought in for well-child examinations. However, all four children were noted to be developmentally normal, and no physical ailments were observed. One of the children needed dental care, which was arranged for by maternal grandmother.[2] The parents acknowledged at the time of the children's removal that this child likely needed dental care, due to what they described as "bottle rot." Tr. p. 37.

[9] Father's criminal history was discussed at the hearing. Father has prior convictions from between 2002 and 2009 for public intoxication, criminal recklessness, resisting law enforcement, criminal mischief, possession of methamphetamine, battery, and domestic battery. The domestic battery charge was for Father's battery of his mother with a baseball bat. In November 2015, Father was charged with battery with a deadly weapon and operating a vehicle

---

[2] During the fact-finding hearing, DCS attempted to introduce copies of the children's medical records into evidence. Mother's and Father's attorneys objected. The trial court stated it was taking the matter under advisement, but it never subsequently stated its ruling on the matter. The records have not been included as an exhibit in the record submitted to this court. In fact, no documentary exhibits are included in the record.

after being adjudged an habitual traffic violator. In December 2015, Father was charged with theft and criminal trespass in one case, and another habitual traffic violator charge in another case. However, law enforcement has not been able to corroborate that Father killed anyone, and he has not been charged with murder, although as of the time of the fact-finding hearing the matter was still under investigation.

[10] Each parent had one prior substantiated case of neglect with DCS. In 2011, Mother was found to have neglected one of the children because of physical violence occurring in front of the child, related to a fight Mother had with her sister. This substantiation resulted in an informal adjustment. In 2005, a case of neglect was substantiated against Father with respect to a child not involved in these proceedings and a woman other than Mother, for that child's failure to thrive. In addition to these substantiations, DCS investigated the family on at least four other occasions between 2012 and 2015 but failed to substantiate claims of neglect, most recently in July 2015. Church testified that these failures to substantiate were not so much because the claims were not proven, but because Mother and Father did not cooperate with DCS investigations.

[11] At the fact-finding hearing, DCS presented the testimony of Scott Mayhew. Mayhew testified that he had purchased at least two guns from Father, the last time being approximately a year earlier. Mayhew also described an altercation sometime in October 2015 involving himself, Father, Mother, and multiple other individuals, in which Father approached Mayhew with a club before being disarmed by Mayhew's son and Mother slapped Mayhew twice. The

children were not present during this altercation; it appears this altercation formed the basis of Father's pending battery charge. Mayhew also said that he had witnessed Father yelling at and being verbally abusive to the children and Mother, although he never witnessed any physical abuse.

[12] After Mayhew testified about the altercation, counsel for DCS asked him whether he had ever observed Father engaged in any illegal conduct, and Mayhew responded that he had witnessed Father sell drugs to a man named Larry Farley. Counsel for Father immediately objected, joined by Mother's attorney, on the basis that they had no notice of any allegation that Father had sold drugs, despite a discovery request asking DCS to reveal any allegations of illegal conduct by Father and Mother. After discussion of the matter with counsel in chambers, the trial court allowed DCS to again ask Mayhew about purported drug dealing by Father. Father objected again, this time on the basis that there was a lack of foundation for the claim that he had dealt drugs. Mayhew testified that Farley had told him Father had sold heroin to him. Father objected to this testimony as hearsay, and the trial court sustained the objection. DCS then clarified with Mayhew that he observed two instances in which Father purportedly sold heroin and that at least some of the children were present on the first occasion but not the second.

[13] On February 1, 2016, the trial court entered orders finding that all four children were CHINS, accompanied by the following findings:

> 1.    Domestic violence has occurred in the home. During the
>        initial assessment Mother indicated concerns about the home

conditions to FCM Supervisor Charlotte Church. Respondent Mother indicated that she did not want DCS to view the family home because it was in disarray after an altercation with [Father], during which he threw and broke items in the home. Respondent Mother provided a different version of events at fact-finding. The Court does not find Mother's in-court testimony relating to this event to be credible and believes that Respondent Mother was being truthful at the time of the assessment.

2. During the assessment phase, FCMS Church attempted to interview Respondent Mother about the allegations privately. Respondent Father interrupted the same and the interview was stopped.

3. Respondent Father has engaged in high risk criminal conduct in the family home. DCS witness Scott Mayhew observed Respondent Father sell narcotics from the home while the Respondents' older Children were present sometime in October, 2015. Scott Mayhew also purchased a firearm from Respondent Father, who is a convicted felon, in the family home. Again, the witness indicated that the Children were present in the home during the transaction. Respondent Mother was also present at the home during both incidents.

4. Respondent Parents both report a history of substance abuse. Both Parents appear to have taken substantial steps in addressing the same. Respondent Father has passed all screens administered by DCS after refusing the first screen offered. Respondent Mother failed her first screen for suboxone after refusing to take the first screen offered. Mother was candid about what the screen results would be and had used suboxone left from a previous, recent prescription.

5. Respondent Father has a history of violent conduct, domestic violence and criminal convictions relating to the same.

Respondent Father is unlikely to seek or receive professional treatment for the same without the coercive intervention of the Court.

6.      Respondent Mother has been unable to ensure the safety of the Child[ren] in the home. Mother's contradictory statements regarding the cause of the disarray in the family home at the time of initial assessment suggests an inability or unwillingness to address the safety concern that domestic violence poses in the home.

App. pp. 37-38. The trial court also specifically found that the children were CHINS under Indiana Code Section 31-34-1-1 and that leaving the children in Mother and Father's care would be contrary to their welfare because "of an inability, refusal or neglect to provide shelter, care, and/or supervision at the present time . . . ." *Id.* at 38. The trial court entered dispositional orders on February 23, 2016. Mother and Father now appeal.

# Analysis

[14]    Mother and Father's overall assertion is that there is insufficient evidence to sustain the finding that their children are CHINS. When reviewing the sufficiency of the evidence for a trial court's CHINS determination, "'[w]e neither reweigh the evidence nor judge the credibility of the witnesses.'" *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). (quoting *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012)). We must instead consider only that evidence supporting the trial court's decision and any reasonable inferences drawn therefrom. *Id.* at 1287.

[15] The trial court here entered limited sua sponte findings and conclusions supporting its CHINS finding, although such findings and conclusions are not statutorily required. *See id.* "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *Id.* We review any remaining issues not covered by the findings under the general judgment standard, meaning we will affirm a judgment if it can be sustained on any legal theory supported by the evidence. *Id.* Also, as a general rule appellate courts grant latitude and deference to trial courts in family law matters. *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record. *Id.*

[16] Under Indiana Code Section 31-34-1-1,[3] a child under eighteen years old is a CHINS if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

---

[3] Indiana Code Section 31-34-1-2 alternatively provides that a child is a CHINS if his or her physical or mental health is seriously endangered due to injury caused by the act or omission of the child's parent or guardian. DCS made no allegation and the trial court made no finding that the children were CHINS under this statutory provision.

> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

DCS bears the burden of proving by a preponderance of the evidence that a child is a CHINS. *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), *trans. denied*.

[17]    A CHINS proceeding focuses on the best interests of the children, not the "guilt or innocence" of either parent. *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). The purposes of a CHINS case are to help families in crisis and to protect children, not punish parents. *S.D.*, 2 N.E.3d at 1285. Governmental intrusion into a family's life is reserved only for families who cannot meet a child's needs without coercion—"not merely those who have difficulty doing so." *Id.* It is not enough for DCS to prove that one or the other of a child's parents suffers from shortcomings; rather, there must be evidence that the parents are unlikely to meet a child's needs absent coercive court intervention. *S.A.*, 15 N.E.3d at 611-12. And, evidence that a child is endangered is not by itself enough to warrant a CHINS finding and the State's parens patriae intrusion into family life. *S.D.*, 2 N.E.3d at 1287. On the other hand, a court need not wait until a tragedy occurs before entering a CHINS finding. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013).

[18]  We first address the trial court's finding that Father "has engaged in high risk criminal conduct in the family home." App. p. 37. The trial court went on to find that Father dealt "narcotics" in the home while the children were present. *Id.* We agree with Mother and Father that there is no admissible evidence to support such a finding. It was based solely upon Mayhew's testimony, who admitted he had no idea what heroin looked like and was told by a third person—who did not testify at the fact-finding hearing—that it was heroin. The trial court sustained Father's hearsay objection to this testimony.

[19]  DCS does not attempt to argue that Mayhew's testimony on this point was admissible; it claims solely that Mother and Father waived any claim of error by failing to timely object. This argument is borderline disingenuous. When Mayhew first mentioned Father's purported sale of heroin, the attorneys for both Mother and Father objected on the basis that they had no notice DCS would attempt to claim that Father had dealt drugs. It is well-settled that DCS must give parents notice of the allegations it intends to pursue in a CHINS case so that the parents may prepare for and attempt to refute them. *See In re Ju.L.*, 952 N.E.2d 771, 778 (Ind. Ct. App. 2011). After an in-chambers discussion, the trial court permitted DCS to continue questioning Mayhew about the purported drug dealing by Father. Father again objected on the basis that DCS had not established a foundation for such evidence. *See Moon v. State*, 560 N.E.2d 76, 76 (Ind. Ct. App. 1990) (noting that lay witnesses may testify to identity of controlled substance based upon the witness's personal experience). After allowing DCS to ask Mayhew how he knew that Father was selling heroin, he

responded that Farley had told him it was heroin. Father objected to this testimony, too, and the trial court sustained it. It was clearly proper to sustain that objection, given that Mayhew was attempting to relate Farley's statement—that he bought heroin from Father—for the truth of the matter asserted. *See* Ind. Evidence Rule 801(c). Mother and Father adequately preserved their claim of error with respect to admission of evidence that Father dealt heroin. Similarly, Mayhew's objected-to testimony that someone had said he or she was going to purchase morphine from Father also was hearsay. Without that evidence, all that Mayhew legitimately testified to is that he saw Father pass something hand-to-hand to another person. There is insufficient evidence to support the finding that Father dealt narcotics.

[20] There is, by contrast, evidence that Mayhew bought two guns from Father. Although Father has not been charged with a crime in connection with these acts, he is a convicted felon, and federal law generally prohibits possession of firearms by felons. *See* 18 U.S.C. § 922(g). The children apparently were present in the home during at least one of these acts.

[21] Indeed, there is a significant pattern of Father having frequently engaged in criminal activity over the years. He was facing a plethora of various charges at the time of the CHINS filing and fact-finding hearing. Some of Father's criminal activities have been violent in nature, such as his battery of his mother with a baseball bat and, more recently, the battery described by Mayhew for which Father was currently facing charges. This corresponds more generally with evidence that Father is, at the least, unpleasant and verbally abusive

toward many people, most importantly Mother and the children. Father's abusiveness was causing problems with visitation prior to the CHINS fact-finding hearing.

[22] Mother has some of her own issues with violence and aggressiveness. The 2011 CHINS adjudication was related to a battery committed in front of one of the children. Mayhew accused her of being involved in the October 2015 altercation and slapping him twice. A medical provider also testified to Mother calling her office after the CHINS case was filed and being verbally abusive to staff.

[23] This brings us to the trial court's finding that domestic violence occurred in the family home. Mother and Father dispute the support for this finding. It is true that Church did not know any details about the "altercation" Mother mentioned to her, aside from the fact that a mirror was broken during it. Tr. p. 35. However, in another display of Father's controlling behavior, he prevented Mother from discussing the incident in detail with Church. It was reasonable for the trial court to infer that a violent incident of some kind occurred in the family home. Also, the trial court was not required to accept Mother's alternative explanation at the fact-finding hearing for how the mirror was broken. We have held that, "a child's exposure to domestic violence can support a CHINS finding." *K.B. v. Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015). Furthermore, there have been multiple studies indicating the harm that witnessing conflict between parents can have on very young children, such as the children here, who are unable to effectively

communicate the effect that such conflict has on them. *See In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014).

[24] The trial court also found that Father "is unlikely to seek or receive professional treatment" to address his history of violent conduct. App. p. 38. We acknowledge the undisputed evidence in the record that Father did make some efforts to seek counseling at three different facilities after the CHINS filing and before the fact-finding hearings. However, we still cannot say the trial court's finding on this point is clearly erroneous. Father's criminal history extends back over a decade, but, as of the fall of 2015, he still was engaging in sometimes violent conduct. Thus, despite previous opportunities to address his violent and aggressive temper, he evidently failed to benefit from those opportunities. Additionally, the evidence indicates Father has very deep-seated emotional or mental health issues that will not respond to ordinary treatment, as two different facilities indicated that they would be unable to assist him. This suggests that Father may require unusual and extensive assistance in addressing his issues, including a neuro-psychological examination, and that coercive intervention will be necessary to ensure that he follows through on that assistance.

[25] In sum, there is sufficient evidence in the record to infer, in particular, that Father's violent temper and aggressiveness and current criminal charges, coupled with his multiple prior convictions, pose a threat to the children's well-being that will not be addressed without coercive court intervention. Mother and Father suggest that there is evidence the children are well cared-for, as

indicated by DCS's lack of concern over the physical condition of the family household and lack of evidence that they suffered from direct physical abuse or were malnourished or anything of that nature. However, this is a request to reweigh the evidence that we must reject. *See In re Des.B.*, 2 N.E.3d 828, 838 (Ind. Ct. App. 2014) (affirming CHINS adjudication based on father's violent conduct despite argument that DCS failed to identify a specific danger caused by parents to children's physical or mental condition and despite evidence that family home was adequate and there was no evidence children were malnourished or unhealthy or directly abused). We also reiterate that the trial court was not required to wait until some actual harm or tragedy occurred before finding that the children were CHINS. *See R.S.*, 987 N.E.2d at 158.

[26] Additionally, there was evidence in the record to indicate that Mother and Father were slipping in their ability to care for the children. The younger two children were not current on their vaccinations, and none of the children were being taken to the pediatrician for regular well-checks. There was no evidence as to Mother and Father having a legitimate reason for endangering their two youngest children by not vaccinating them. One of the children needed immediate dental care; Mother and Father were aware of this fact but had failed to seek treatment.

[27] We acknowledge that Mother and Father have taken some steps to address the multiple issues they face. Although both parents have a history of substance abuse, it appears they both were making progress in treating that problem, as

indicated by their prescriptions for Suboxone[4] and their repeated negative drug screens during the pendency of the CHINS case.[5] Indeed, the trial court's finding regarding Mother and Father's drug use would not seem to support a CHINS finding because they are addressing that issue without coercive court intervention. Still, the parties' drug use was but one part of a multitude of problems they were facing, and it is reasonable to infer they may need coercive government assistance in remedying all of them. Additionally, much of the evidence in this case is directed towards Father's behavior; there is some with regard to Mother but not as much. However, a CHINS finding is based upon the condition of the child and may be based solely upon the acts or omissions of one parent. *N.E.*, 919 N.E.2d at 105. Particularly in light of the deference we grant to trial courts in cases such as this, we cannot say the trial court clearly erred in finding the children here to be CHINS.

---

[4] DCS seems to suggest Mother was illegally taking Suboxone without a prescription from her July 2015 bottle. However, a prescription is valid for one year in Indiana. *See* Ind. Code § 25-26-13-25(h). Also, if in fact Mother was still taking pills from July 2015 in November 2015, that would seem to indicate she was taking less of the drug than prescribed, which would not seem to be problematic so long as she was not abusing other drugs, and there is no evidence that she was.

[5] DCS attempts to direct this court to websites regarding the ability to falsity drug test results. There was no evidence whatsoever presented at the fact-finding hearing on this matter, and we will not accept DCS's apparent invitation to judicially notice these websites and to improperly supplement the record in this fashion. *See Troyer v. Troyer*, 987 N.E.2d 1130, 1138 n.3 (Ind. Ct. App. 2013) (reciting established principle that judicial notice may not be used on appeal to fill evidentiary gaps in trial court record caused by party's failure to present evidence at trial).

# Conclusion

There is sufficient evidence in the record to support the conclusion that Mother and Father's children are CHINS.  We affirm.

Affirmed.


Riley, J., and Bailey, J., concur.