FILED

Jan 31 2024, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT-
MOTHER
Kay A. Beehler
Terre Haute, Indiana

ATTORNEY FOR APPELLANT-
FATHER
Michael G. Moore
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of N.E., Minor
Child Alleged to be a Child in
Need of Services;

C.E. (Mother) and S.E. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

January 31, 2024

Court of Appeals Case No.
23A-JC-996

Appeal from the Vigo Circuit
Court

The Honorable Lakshmi B. Reddy,
Special Judge

Trial Court Cause No.
84C01-2212-JC-1185

**Opinion by Judge Tavitas**
Judges Pyle and Foley concur.

**Tavitas, Judge.**

## Case Summary

[1] The Department of Child Services ("DCS") filed a petition alleging that N.E., the child of C.E. ("Mother") and S.E. ("Father") (collectively, "Parents"), was a child in need of services ("CHINS"), and the trial court granted the petition. Parents appealed the trial court's CHINS adjudication, and the adjudication was reversed on appeal. DCS then filed a second CHINS petition. The trial court again found that N.E. is a CHINS and also found Parents in contempt.

[2] In this consolidated appeal, Mother argues that: (1) the second CHINS petition was barred by res judicata; (2) Mother's due process rights were violated; (3) the trial court abused its discretion by considering child hearsay; and (4) the evidence does not support a finding that N.E. is a CHINS. Father argues: (1) the second CHINS petition was barred by res judicata; (2) the trial court committed fundamental error by admitting certain evidence; (3) the evidence does not support a finding that N.E. is a CHINS; and (4) the trial court erred by finding Father in contempt. We disagree with Parents' arguments except for Father's arguments regarding the contempt finding. Accordingly, we affirm in part and reverse in part.

## Issues

[3] Parents raise numerous issues, which we consolidate and restate as:

      I.     Whether the second CHINS petition was barred by res judicata.

      II.    Whether Mother's due process rights were violated.

III. Whether the trial court abused its discretion or committed fundamental error by admitting certain evidence.

IV. Whether the evidence is sufficient to sustain the trial court's finding that N.E. is a CHINS.

V. Whether the trial court erred by finding Father in contempt.

## Facts

Mother and Father have one child together, N.E., who was born in January 2021. Mother has two other biological children, F.C. and D.T.[1], and Father has four other biological children, including M.E. Several of these children have been the subject of CHINS petitions, and Parents have a history of hostility toward DCS and failure to cooperate with DCS. This particular case concerns only N.E.'s status as a CHINS.

On October 14, 2021, DCS filed a petition alleging that N.E. was a CHINS ("First Petition"). DCS alleged that Parents were involved in an "argument and/or domestic violence incident" during which N.E. was in Mother's arms. Ex. Vol. VIII p. 209. Parents left N.E. in the care of a neighbor while Parents allegedly went to the hospital. When a stranger arrived at the neighbor's house to take N.E., the neighbor contacted law enforcement. Law enforcement

---

[1] D.T.'s father has custody of him.

discovered that Parents' residence did not have functioning toilets, electricity, or water, and was extremely cluttered. DCS was unable to locate Parents and, thereafter, removed N.E.

[6] Shortly after N.E. was removed from Parents' care, DCS also removed F.C. from Mother's and F.C.'s father's care. DCS filed a petition alleging that F.C. was a CHINS due to Mother's intoxication and the fact that F.C.'s father was homeless. As part of these proceedings, Parents refused to participate in drug screens. The trial court adjudicated both N.E. and F.C. as CHINS on December 13, 2021, and issued a dispositional order on January 13, 2022. Parents appealed this determination.

[7] During the pendency of the appeal, Parents did not comply with court-ordered services and did not begin visiting N.E. until April 2022. Even after Parents began attending the supervised visits, they participated inconsistently. Parents often appeared late or did not appear at all for the visits. On one occasion, Father brought a large hunting knife and a "set of nunchucks"[2] to a visit. Tr. Vol. III p. 155. On another occasion, Parents argued during the visit, which upset the children, and the children hid under a table. In November and December 2022, Father smelled of marijuana during visits. Father often argued with visitation supervisors and behaved aggressively and erratically.

---

[2] Nunchucks are "a weapon that consists of two sticks joined by a short length of cord, chain, or rawhide." https://www.merriam-webster.com/dictionary/nunchuck [https://perma.cc/XDB3-HB98] (last visited Jan. 8, 2024).

Ultimately, multiple supervised visitation providers refused to work with Parents further. Additionally, Parents refused to participate in other services offered by DCS.

[8] In April 2022, DCS filed a petition alleging that Father's four-year-old child, M.E., was a CHINS.[3] DCS alleged, in part, that: (1) M.E. was living with Parents; (2) M.E. had "unexplained bruises all over her body;" (3) the home does not have running water and M.E. "had not been bathed in recent days or weeks"; (4) M.E. reported that Father and Mother (M.E.'s stepmother) fight verbally and physically; (5) M.E. reported that Mother "has choked her"; and (6) M.E. "does not feel safe in Father's home." Ex. Vol. VIII p. 153. Parents refused to open the door when DCS made multiple attempts to interview them and view the residence.

[9] The trial court found M.E. to be a CHINS due, in part, to ongoing domestic violence in the home of Parents. As part of the dispositional order in M.E.'s CHINS case, the trial court ordered Parents, in part, to submit to random drug screens, participate in a domestic violence assessment and programs, and allow DCS to make announced and unannounced visits to the home. Parents,

---

[3] M.E. was also the subject of CHINS petitions in 2017 and 2020.

however, refused to participate in services except for supervised visitations, and Mother participated only in a few months of home-based case work.[4]

[10]   On May 2, 2022, Mother filed a petition for dissolution of marriage and a petition for a protection order. In the petition for a protection order, Mother stated, under the penalties of perjury, that: (1) Father "would slap [her] in [her] face, choke [her], and not let [her] out of the house;" (2) during sexual intercourse, Father "started choking [her] so hard it broke blood vessels in [her] face;" (3) Father "left [her] tied up so long [she] urinated on [herself];" and (4) while Mother was at a shelter, Father kept circling around the building waiting for her to exit. Ex. Vol. VIII p. 61. The trial court granted Mother's petition for a protection order.

[11]   On May 15, 2022, Mother was charged with battery, domestic battery, and residential entry after she entered Father's residence and battered Father and two others. The trial court issued a no contact order, which ordered Mother to have no contact with Father and the two others.

[12]   On June 12, 2022, Mother requested that the dissolution petition and protection order be dismissed. Mother claimed that the dissolution petition and protection order were being "cited in a juvenile court case against [her]" and were complicating "almost everything in our day to day lives." *Id.* at 71, 73. Mother

---

[4] Father and M.E.'s mother appealed the CHINS determination, and this Court affirmed. *See In Matter of M.E.*, No. 22A-JC-2373 (Ind. Ct. App. June 28, 2023) (mem.).

stated that Parents "decided to work things out and go to [counseling]." *Id.* at 73. The trial court then dismissed the dissolution petition and protection order.

[13] On October 24, 2022, another panel of this Court reversed the First CHINS determinations as to both N.E. and F.C. *See In re N.E.*, 198 N.E.3d 384 (Ind. Ct. App. 2022) (with J. Vaidik dissenting). As to N.E., the panel held:

> DCS has not presented evidence that N.E. has been harmed or endangered because of Mother's mental health or inadequacy of the family home. While Mother had a mental breakdown and the family home was found to be inadequate on October 13, 2021, these conditions were voluntarily and without court coercion remedied by the parties, and therefore they are insufficient to support a CHINS determination.

*Id.* at 392. As to F.C., the panel held: "Even if we are persuaded by DCS's allegation of Mother's intoxication on this one occasion, DCS did not present evidence that F.C. had been impacted in any way, let alone seriously endangered." *Id.* at 393. Further, F.C.'s father had arranged for adequate housing.[5]

[14] DCS did not seek rehearing or transfer. Rather, DCS filed a second CHINS petition on December 7, 2022 ("Second Petition"). The Second Petition alleged, in part, that the following occurred after N.E. was first found to be a CHINS: (1) Mother and Father failed to participate in visitation with N.E. for

---

[5] After the reversal of the CHINS finding, F.C.'s father apparently received custody of F.C.

eight months; (2) once Parents began to participate in visitation with N.E. and their other children, they were often late, missed visitations, failed to follow rules of visitation, argued with and threatened visitation supervisors, and appeared for visitation under the influence of substances; (3) in October 2022, Father allegedly pointed a gun at a man[6]; (4) in October 2022, Father and maternal grandmother posted concerning matters on social media; (5) in May 2022, Mother allegedly broke into Father's residence and assaulted Father and two others, and Mother was charged with domestic battery, battery resulting in bodily injury, and battery; (6) in May 2022, Mother filed a petition for dissolution of marriage and requested a protection order due to concerning domestic violence, which was granted; and (7) Parents have persistently failed to comply with trial court orders in the CHINS cases of their other children.

[15] Mother and Father denied the allegations of the Second Petition, and Father indicated that he intended to represent himself in the action. Mother, however, requested an appointment of counsel. The trial court judge recused himself, and a special judge was appointed to hear the Second Petition.

[16] Mother filed a motion to dismiss the Second Petition. Mother argued that the Second Petition was barred under the "claim preclusion branch of the doctrine of res judicata." Appellants' App. Vol. II p. 126. According to Mother, the Second Petition was based upon evidence from "the flawed determination by

---

[6] In October 2022, the Terre Haute Police Department received a report that Father harassed a man, drove by the man's house repeatedly, threatened to kill the man, and pointed a firearm at the man.

DCS and the trial court that parents' actions in October 2021 endangered the child in a manner requiring the coercive intervention of the court." *Id.* at 127. Mother requested that the trial court dismiss the Second Petition or, alternatively, strike any allegations related to or flowing from the First Petition. The trial court denied Mother's motion to dismiss and found:

> The second Petition filed by DCS on December 6, 2022, does contain new allegations of material fact which are separate from what was available to DCS at the [time] of the original fact finding hearing back in 2021. As such, the principle of res judicata does not apply and there is no basis to dismiss the Petition filed on December 6, 2022.

> Mother also requests that the Court strike any allegations in the second Petition that are relating to or flowing from the October 2021 Petition. There is no basis to strike these allegations. "Evidence of a parents' past involvement with DCS or the criminal justice system is usually relevant to the central question of a CHINS proceeding." *In re Eq.W*[.], 124 N.E.3d [1201, 1210 (Ind. 2019)]. *See also* Indiana Code Section 31-34-12-5. While the allegations contained in the October 2021 Petition cannot be used as a basis for a CHINS finding regarding the second Petition, the allegations can be factored in to make a determination after the fact finding hearing. For this reason, Mother's request to strike allegations is also denied.

*Id.* at 132-33.

[17] On January 25, 2023, Parents were evicted from their residence. The trial court conducted a fact-finding hearing on the Second Petition on January 27, 2023, February 1, 2023, and February 2, 2023. During Mother's testimony, she

denied filling out or signing the petition for protection order, which contained accusations of abuse by Father. Mother testified that DCS is "ruthless" and just wants to take the children "so they can get their check or whatever bonus that they want and they don't care." Tr. Vol. II p. 180. On February 2, 2023, the trial court ordered Parents to participate in a hair and nail follicle drug test and alcohol test by February 6, 2023.

[18] On February 14, 2023, the trial court issued extensive findings of fact and conclusions thereon and determined that N.E. is a CHINS. On March 8, 2023, the trial court entered a dispositional order. The trial court again ordered Parents to submit to a hair follicle test.

[19] At the dispositional hearing, the Court Appointed Special Advocate ("CASA") testified that N.E. has a mass on her back that doubled in size during the fall of 2022. Doctors at Riley Children's Hospital recommended that an MRI be conducted under sedation to examine the mass. Parents, however, disputed the necessity of an MRI and requested a second opinion. A second opinion was obtained on March 14, 2023, and the second doctor also recommended an MRI. Although Parents were informed of this second appointment, they did not attend.

[20] On May 10, 2023, the trial court conducted a review hearing and a hearing regarding N.E.'s medical issue. Parents did not appear at the hearing, but their

counsel were present.[7] As for N.E.'s medical matter, the trial court granted DCS's request for the MRI under sedation at Riley Children's Hospital. DCS reported that Parents had twice been ordered to submit to a hair follicle test but had failed to do so. DCS requested that the trial court find Parents in contempt of court. The trial court set the matter for a contempt hearing on May 31, 2023. The trial court sent another referral for Parents to complete a hair follicle test.

[21] The trial court also issued an order regarding the review hearing on May 11, 2023:

> The Court hereby holds [Parents] in contempt for violating Court Orders dated February 2nd and 27, 2023, instructing them to take hair follicle drug tests and for failing to appear for the hearing scheduled for May 10, 2023, which was not only a review hearing but a hearing to address a medical issue involving [N.E.]. A contempt hearing to impose sanctions is hereby scheduled for May 31, 2023, at 8:00 a.m. . . .
>
> [ ] The Court has issued another Referral for Hair Follicle Drug Testing which permits the parties to take such test through May 30, 2023, giving them an opportunity to come within compliance prior to the contempt hearing. The parents are reminded that sanctions for a contempt finding may include monetary sanctions, community service and/or jail time.
>
> [The] Court orders Mother and Father to obtain a 10[-]panel hair follicle drug test at Right Choice D.A.T. by no later than May 30,

---

[7] Although Father was pro se during the fact-finding hearing, he was now represented by counsel.

2023.  A Referral Sheet is attached and the costs of the test will be paid for by the Department of Child Services.

Appellants' Amended Consol. Suppl. App. Vol. II p. 14.[8]

[22]     Parents failed to complete the hair follicle test and did not appear for the May 31, 2023 hearing because they claimed that Mother was in the emergency room. The trial court rescheduled the hearing for June 7, 2023.

[23]     On June 7, 2023, Parents and their counsel appeared for the "rule to show cause" hearing.  Tr. Vol. VI p. 105.  DCS reported that it still had not received any hair follicle test results regarding Parents.  Father and Mother both testified that they went to the testing facility a few days earlier but that the referral had expired.  The trial court then stated:

> I will also let the record reflect that prior to this hearing starting I had my court reporter call Right Choice D.A.T. to see if either party had taken a test or appeared and the response was no [Parents] had not appeared to take a test.  So, court having already found them in contempt they are found in contempt for their failure to appear at the review hearing on May tenth (10th). Which was not only a review hearing but also a hearing to determine whether or not the court should authorize DCS . . . to proceed with an important medical procedure for their child. [T]hey didn't appear for the contempt hearing scheduled last week but I understand [Mother] was in the hospital and they couldn't show up.  They're also found in contempt [of] court

---

[8] This Appendix was marked received by the Clerk's office on September 25, 2023, but Parents failed to correct defects and the document was not filed.  We will, however, consider the trial court's orders which are available to us on Odyssey.

because the court ordered a hair follicle drug screen on February first (1st), February twenty-seventh (27th), it was also in the order dated March eighth (8th) and then again most recently on or about May thirtieth (30th). Not only that they have not complied with the orders DCS . . . take their random drug screens or other procedures. Sanction is forty-five (45) days for each of them in jail starting immediately.

*Id.* at 117-18.

[24] The trial court then issued a written order on the contempt finding, in part, as follows:

In the May 11th Order, this Court found the parties in contempt for failing to appear at the May 10th hearing and for violating the Court Orders instructing them to take hair follicle drug screens. Another referral was provided giving the parties until May 30th to take a drug screen to get in compliance.

Just minutes prior to the hearing on June 7, 2023, the Court Reporter contacted Right Choice DAT to see if the parties had appeared for a drug test and they had not. During the hearing, Father testified that they did appear for a drug screen, but that the Referral had expired. Allegedly, Mother went inside Right Choice DAT and was informed that the Referral had expired so the test was not given. Father could not recall which day and/or time they showed up which is unbelievable to this Court that the parties could not remember when this took place within the last seven (7) days. At one point, Father indicated they showed up on Friday, but that would have been June 2nd and the Referral would have still been valid. Mother then testified vaguely that it was maybe a Saturday, Sunday or Monday. However, Right Choice DAT is not open over the weekend. Moreover, because this Court routinely orders hair follicle drug tests at Right Choice DAT, it is aware that if a family shows up for a drug test and

there is a discrepancy in whether the Referral is valid, the organization calls the Court Staff to confirm whether the test should be given since the tests are paid for through grant funds.

The Court has no reason to believe that the parents attempted to take the drug screens and get in compliance with the Court Order, despite being given numerous chances. Both parties also had hair which was dyed bright red and orange which can often skew drug test results. The Court also has suspicion that both parties were under the influence of some type of substance during the hearing based upon their facial expressions and responses to questions.

When asked why the parties did not appear for the May 10th hearing, Father testified that he did not realize that he had to appear for just a review hearing. Then, he indicated that he was not getting notices. Both public defenders stated as officers of the Court that they advised the parties of the hearing date. Additionally, the parents are involved in numerous CHINS cases and have routinely attended review hearings. The suggestion that they did not realize they had to be present is not credible.

* * * * *

For this reason and based upon the evidence presented during this contempt hearing, the Court imposes sanctions to be for each of them to serve an individual sentence of forty-five (45) days in the Vigo County Jail. . . .

* * * * *

The Court will consider suspending the jail sentence sanction under the following conditions. First, both parents must now take either a nail bed or body hair 12 panel drug test since their

head hair has been dyed. . . . If the drug tests results are negative, the Court may consider purging the jail sentence if the parties also submit to the other conditions. If the drug test results are positive, then the Court may suspend the jail sentence if the parties will voluntarily participate in an in-patient drug addiction/recovery program that is at least 28 days at a minimum and which will be paid for by the State. The second condition is that the parties sign a document agreeing to participate in the services recommended by DCS. So long as they participate in all the services recommended and ordered by the Court, then the jail sentence will remain suspended, but if they fail to participate then they will be required to complete the entire jail sentence.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that [Parents] are hereby sanctioned for being in contempt of Court and ordered to each serve forty-five (45) consecutive days of jail time at the Vigo County Jail. The terms upon which this jail sentence may be suspended and/or purged are set forth above. To be clear, the finding of contempt and imposed jail sentence sanction is for failure to appear on 5/10/2023 and failure to comply with orders dated 2/1/2023, 2/27/2023, 3/8/2023, 5/10/2023 and 5/30/2023 for drug testing.

Appellants' Amended Consol. Suppl. App. Vol. II pp. 18-21. Parents appealed the second CHINS determination and later filed an amended notice of appeal to add the contempt order.

## Discussion and Decision

### I. Res Judicata

[25] Parents argue that the Second Petition was barred by res judicata. Res judicata operates "to prevent repetitious litigation of disputes that are essentially the same, by holding a prior final judgment binding against both the original parties and their privies." *Matter of Eq.W.*, 124 N.E.3d 1201, 1208 (Ind. 2019). This doctrine applies "where there has been a final adjudication on the merits of the same issue between the same parties." *Id.* Similar to double jeopardy in the criminal context, res judicata operates to prevent a party from receiving the proverbial "second bite at the apple." *Id.*

[26] We begin by noting that, although Mother filed a motion to dismiss the Second Petition on res judicata grounds, Father, who was pro se, did not. Our Supreme Court has held that res judicata "must be raised by a party to the proceeding so as to bring it to the court's attention for review." *Id.* at 1213. "[T]he best practice for the moving party is to move for dismissal on res judicata grounds at the earliest opportunity." *Id.* at 1214. Accordingly, although Father waived the issue by failing to bring it to the trial court's attention, we will address res judicata because Mother raised the issue.

[27] There are two branches of res judicata: claim preclusion and issue preclusion. *Id.* at 1209. Claim preclusion, which is at issue here, can be used to bar a successive lawsuit when "a particular [claim] is adjudicated and then put in

issue in a subsequent suit on a different cause of action between the same parties or their privies." *Id.*

> Before a court can find that claim preclusion applies to bar a subsequent action, four essential elements must be met:
>
> > (1) The former judgment must have been rendered by a court of competent jurisdiction;
> >
> > (2) The former judgment must have been rendered on the merits;
> >
> > (3) The matter now in issue was or might have been determined in the former suit; and
> >
> > (4) The controversy adjudicated in the former suit must have been between the parties to the present action or their privies.

*Id.*

[28] It is undisputed that the order on the First Petition was rendered by a court of competent jurisdiction; that judgment in the first CHINS proceeding was rendered on the merits; and that the first CHINS proceeding concerned the parties to this action. Accordingly, only the third element—whether the matter at issue in this action "was or might have been determined" in the First Petition—is at issue here. *Id.*

[29] Our Supreme Court has recently addressed a similar issue in two opinions. First, in *Eq.W.*, DCS filed a CHINS petition but failed to present sufficient

evidence at the fact-finding hearing, and the trial court dismissed the first petition without prejudice. The day after the first petition was dismissed, DCS filed a second CHINS petition. The trial court later found that the children were CHINS.

[30]     On appeal, our Supreme Court held that "the claim preclusion branch of res judicata applies to CHINS proceedings." *Id.* at 1211. "[I]nvocation of this doctrine could prevent repeated filings by DCS with no new factual basis until one petition finally sticks. It could also prevent repetitive litigation of issues that have been or could have been decided in an initial CHINS filing." *Id.* "[T]o escape the preclusive effect of res judicata in a CHINS proceeding, the State's subsequent petition must include new allegations of material fact separate from what was available to DCS to use at the original fact-finding hearing." *Id.* at 1212.

> Practically speaking, if the parent or guardian is successful in showing claim preclusion applies to bar a subsequent petition, the CHINS petition must be dismissed. However, this dismissal does not mean the State is forever barred from filing a subsequent CHINS petition or even from using a parent's prior actions as evidence in support of a new filing. As long as there are no other procedural bars to the filing and the State demonstrates that the subsequent petition contains new allegations of conduct that took place after the dismissal of the prior proceeding, the State may file a new CHINS petition.

*Id.* Ultimately, the Supreme Court affirmed the second CHINS determination because the parents failed to raise the issue of res judicata in the trial court.

[31]     Then, the Supreme Court decided *R.L. v. Indiana Dep't of Child Servs. & Child Advocs., Inc.*, 144 N.E.3d 686, 687 (Ind. 2020). There, the trial court first determined that the child was not a CHINS. Five days later, DCS filed a second petition alleging that the child was a CHINS, which the trial court eventually granted. On appeal, our Supreme Court found that "[t]he subsequent petition was largely duplicative of the first and enunciated three new, weakly supported allegations." *Id.* at 691. Our Supreme Court held that the mother's motion to dismiss the second petition should have been granted because the second petition was barred by res judicata.

[32]     Here, the First Petition, which was filed in October 2021, alleged that Parents left N.E. with a neighbor after they were involved in an "argument and/or domestic violence incident" during which N.E. was in Mother's arms. Ex. Vol. VIII p. 209. Law enforcement also discovered that Parents' residence did not have functioning toilets, electricity, or water and was extremely cluttered. Fact-finding hearings were held in early December 2021, and the First Petition was granted on December 13, 2021. That CHINS finding was reversed by this Court, and DCS filed the Second Petition on December 7, 2022.

[33]     The Second Petition mentioned some of Parents' history with DCS. The Second Petition, however, also alleged multiple issues that occurred **after** N.E. was first found to be a CHINS in December 2021. Specifically, DCS alleged that: (1) Mother and Father failed to participate in visitation with N.E. for eight months; (2) once Parents began to participate in visitation with N.E. and their other children, they were often late, missed visitations, failed to follow rules of

visitation, argued with and threatened visitation supervisors, and appeared for visitation under the influence of substances; (3) in October 2022, Father allegedly pointed a gun at a man; (4) in October 2022, Father and N.E.'s maternal grandmother made concerning social media posts regarding Father's and Mother's conduct; (5) in May 2022, Mother was charged with domestic battery, battery resulting in bodily injury, and battery based on an incident with Father and two others; (6) in May 2022, Mother filed a petition for dissolution of marriage and requested a protection order due to concerning domestic violence, which was granted; and (7) Parents have persistently failed to comply with trial court orders in the CHINS cases of their other children. The trial court found that res judicata was inapplicable because the Second Petition "does contain new allegations of material fact which are separate from what was available to DCS at the [time] of the original fact finding hearing back in 2021." Appellants' App. Vol. II p. 132.

[34] We agree with the trial court. The Second Petition included allegations of conduct that occurred after the First Petition was filed and after the fact-finding hearings on the First Petition. Accordingly, the Second Petition included "new allegations of material fact separate from what was available to DCS to use at the original fact-finding hearing." *Eq.W.*, 124 N.E.3d at 1212. Mother failed to demonstrate that the matters now at issue in the Second Petition were or might have been determined in the First Petition. We, thus, conclude that the trial court properly denied Mother's motion to dismiss on grounds of res judicata.

## II. Mother's Due Process Rights

Next, Mother argues that her due process rights were violated by DCS's failure to perform a second investigation before filing the Second Petition. "Due process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893 (1976)). Due process at all stages of a CHINS case is vital because "'procedural irregularities, like an absence of clear findings of fact, in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights.'" *Id.* at 1258 (quoting *In re J.Q.*, 836 N.E.2d 961, 967 (Ind. Ct. App. 2005)). Due process in a CHINS adjudication turns on balancing the three *Mathews* factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* at 1257.

Mother argues that "[t]he absence of a Form 310 report of abuse or neglect, and the required Form 311 following investigation of allegations contained in a Form 310 report, deprived Mother of any opportunity to administratively appeal the 'substantiation' of abuse or neglect because there were admittedly no such reports, and no substantiation." Mother's Appellant's Br. p. 18. DCS is statutorily required to assess all reports of child abuse and neglect. *In re F.S.*, 53 N.E.3d 582, 598 (Ind. Ct. App. 2016). According to DCS, a DCS Form 310 is

completed after an initial report from the child abuse "hotline."[9] Tr. Vol. II p. 206. The DCS Form 311 is then completed after a caseworker conducts an assessment of the report. *See* § 19:16. Assessment and determination, 15A IND. PRAC., FAMILY LAW—CHILDREN IN NEED OF SERVICES § 19:16 (2023-2024 ed.) ("As the initial report is documented in the so-called '310,' the Department documents its assessment, including the 'substantiated/unsubstantiated' determination, in a '311.'").

[37] Our review of the *Mathews* factors reveals no due process violation. Mother claims that her private interests were impacted because she was denied the ability to administratively appeal a substantiation of neglect or abuse by DCS's chosen procedure. The governmental interest in the assessment, however, is described in Indiana Code Section 31-33-8-6, which provides: "The primary purpose of the assessment is the **protection of the child**." (emphasis added). As for the risk of error created by the State's chosen procedure, DCS was well aware of Parents' behaviors after the fact-finding hearing on the First Petition, and those behaviors were documented in the multiple on-going CHINS proceedings. DCS determined that a Form 310 and, thus, a Form 311 were unnecessary. DCS proceeded straight to filing the Second Petition regarding N.E. Given the evidence presented at the fact-finding hearings, even if DCS

---

[9] DCS has a special hotline for reporting allegations of child abuse. *In re Ju.L.*, 952 N.E.2d 771, 774 (Ind. Ct. App. 2011). "Once a person makes an allegation to the hotline, a member of DCS creates a narrative summary of the allegation in a report called a 310 report. Then, an investigative case manager investigates the allegations described in the 310 report and determines whether the allegations are substantiated." *Id.*

had utilized the Form 310/311 procedures and Mother had been able to administratively appeal a substantiation of neglect or abuse, her administrative appeal would likely have been unsuccessful. Under these circumstances, a balancing of the three *Mathews* factors reveals no due process violation.

### III. *Admission of Evidence*

[38] Next, both Mother and Father challenge the admission of certain evidence during the fact-finding hearings. Our standard of review of a trial court's admission or exclusion of evidence is an abuse of discretion. *Griffith v. State*, 31 N.E.3d 965, 969 (Ind. 2015). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court. *In re Des.B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014). "It is well-established that 'errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.'" *Id.* (quoting *Sibbing v. Cave*, 922 N.E.2d 594, 598 (Ind. 2010)). To determine whether the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence upon the finder of fact. *Id.* "Likewise, reversible error cannot be predicated upon the erroneous admission of evidence that is merely cumulative of other evidence that has already been properly admitted." *Id.*

### A. *Mother's Arguments*

[39] Mother argues that the trial court abused its discretion by admitting Exhibits 6, 14, 15, 17, and 19 over Mother's objection. Mother, however, does not even

identify the content of these exhibits and only makes a brief argument concerning the foundation of photographs and messages from Father's social media page, which were included in DCS Exhibits 19 and 21.

[40] We conclude that this argument is waived. First, Mother has failed to make a cogent argument on appeal. *See* Ind. Appellate Rule 46(A)(8); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding that the failure to present a cogent argument waives the issue for appellate review), *trans. denied*. Moreover, Mother did not argue to the trial court that the exhibits lacked foundation. *Mid-States Gen. & Mech. Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 438 n.2 (Ind. Ct. App. 2004) ("An appellant who presents an issue for the first time on appeal waives the issue for purposes of appellate review."). Accordingly, this argument is waived.

[41] Mother next argues that the trial court abused its discretion by admitting hearsay statements from M.E. without conducting a hearing under Indiana Code Section 35-37-4-6.[10] Again, Mother fails to specifically identify the statements at issue here. We note that Bailey Poore, an assessment worker with DCS, testified that she conducted an assessment regarding M.E. in April 2022, which resulted in a CHINS petition regarding M.E. Mother objected to any testimony regarding M.E.'s statements to Poore, and the trial court sustained

---

[10] Indiana Code Section 35-37-4-6 allows for the admission of a statement made by a protected person under certain circumstances, but a hearing on the matter must be held.

the objection. Poore testified only to her observations of M.E., not M.E.'s statements to Poore.

[42] Later during the fact-finding hearing, Father questioned DCS employee Heidi Deckard regarding who was responsible for M.E.'s April 2022 bruising, and Deckard responded that "the child reported that [Mother] caused the injury." Tr. Vol. V p. 47. Mother did not object. DCS's attorney then asked Deckard if "the family case manager talk[ed] to M.E. about how she got the bruises," and Mother objected. *Id.* at 48. The trial court pointed out that M.E.'s statement had already been elicited by Father and that Mother did not object to Father's question. Accordingly, Mother waived any objection to the admission of M.E.'s statement.

[43] Waiver notwithstanding, the trial court stated that it would not consider M.E.'s statements, and in its findings of fact and conclusions thereon, the trial court did not find that Parents abused M.E. Because the trial court did not consider M.E.'s statements, any error in the admission of M.E.'s statements was harmless.

### B. Father's Arguments

[44] Father argues that the trial court abused its discretion by admitting certain evidence. Father, however, concedes that he did not object to any of the evidence and contends that the trial court committed fundamental error by admitting the evidence.

[45] "On rare occasions, appellate courts may analyze an issue under the fundamental error doctrine to examine an otherwise procedurally defaulted claim." *Eq.W.*, 124 N.E.3d at 1214. "[T]his review is extremely narrow and 'available only when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make a fair trial impossible.'" *Id.* (quoting *Jewell v. State*, 887 N.E.2d 939, 942 (Ind. 2008)).

[46] Father identifies the admission of the following evidence as fundamental error: (1) the allegations from the First Petition; (2) the police report and probable cause affidavit from Mother's May 2022 arrest and the trial court's questions of Mother regarding the same; (3) "[h]earsay included within a report of abuse or neglect included in a petition for rule to show cause," Father's Br. p. 25; (4) Facebook posts of third parties regarding Parents; (5) an April 2022 Facebook post that "included comments about 'cps' [sic] and included a video of [Father] drinking what appeared to be a bottle of alcohol," *id.*; (6) a May 2022 Facebook post that included a video of a verbal altercation between Father and another person; (7) "[a] series of provider Reports that included a large amount of hearsay," *id.*; (8) a May 2022 Facebook post that included rap lyrics; (9) two October 2022 police reports regarding altercations between Father and other persons; (9) hearsay statements in an eviction filing; and (10) Father's conviction at the age of sixteen and other criminal charges that were dismissed.

[47] Father provides little or no analysis of his claims that this evidence was inadmissible. Further, Father claims, without explanation, that the admission of this evidence cumulatively resulted in the denial of a fair trial. "We will not become an advocate for a party or address arguments that are inappropriate or too poorly developed or expressed to be understood." *Stark v. State*, 204 N.E.3d 957, 963 (Ind. Ct. App. 2023). Given Father's lack of cogent analysis, we conclude that this issue is waived.

## IV. CHINS Determination

[48] Parents challenge the sufficiency of the evidence to support the trial court's determination that N.E. is a CHINS. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010); *see* Ind. Code § 31-34-12-3. On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re D.J.*, 68 N.E.3d 574, 577-78 (Ind. 2017). Here, the trial court sua sponte entered findings of fact and conclusions thereon in granting the Second CHINS petition. "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). We review the remaining issues under the general judgment standard, which provides that a judgment "'will be affirmed if it can be sustained on any legal theory supported by the evidence.'" *Id.* (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.

1997)).  We will reverse a CHINS determination only if it is clearly erroneous. *D.J.*, 68 N.E.3d at 578.

[49] DCS must prove three elements for a juvenile court to adjudicate a child a CHINS: (1) the child is under the age of eighteen; (2) that one of eleven different statutory circumstances exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court.  *Id*. at 580.

[50] Here, the trial court found N.E. was a CHINS under the general category of neglect as defined in Indiana Code Section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> > (A) when the parent, guardian, or custodian is financially able to do so; or
> >
> > (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

The statute contains three basic elements: (1) the parent's actions or inactions have seriously endangered the child; (2) the child's needs are unmet; and (3) those needs are unlikely to be met without State coercion. *S.D.*, 2 N.E.3d at 1287.

[51] "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105. "A CHINS adjudication focuses on the condition of the child . . . . [T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id.* (citations omitted). "A CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard." *S.D.*, 2 N.E.3d at 1290.

[52] Before addressing Parents' arguments, we note that Parents seem to contend that the trial court could not rely upon evidence of their acts prior to the adjudication of the First Petition. Our Supreme Court has held that "past acts by parents can be relevant to new CHINS filings involving the same parents and children." *Eq.W.*, 124 N.E.3d at 1211. In fact, Indiana Code Section 31-34-12-5 provides:

Evidence that a prior or subsequent act or omission by a parent, guardian, or custodian injured or neglected a child is admissible in proceedings alleging that a child is a child in need of services to show the following:

(1) Intent, guilty knowledge, the absence of mistake or accident, identification, the existence of a common scheme or plan, or other similar purposes.

(2) A likelihood that the act or omission of the parent, guardian, or custodian is responsible for the child's current injury or condition.

Accordingly, the trial court was not required to ignore evidence of Parents' acts prior to the adjudication of the First Petition. That evidence was relevant to the adjudication of the Second Petition, although the Second Petition could not be based solely upon allegations adjudicated in the First Petition. *See supra* Part I (discussing res judicata).

### A. Seriously Endangered

[53] Parents challenge the trial court's finding that N.E. is seriously endangered. Parents argue that they could not have seriously endangered N.E. because she was in foster care during the relevant time period. Parents seem to contend that, unless N.E. was in their direct physical care, they could not seriously endanger her.

[54] The trial court found N.E. seriously endangered due to unexplained bruising to several of Parents' children and domestic violence between Parents and other violence committed or threatened by Parents. N.E., M.E., and another sibling

were observed to have "unexplained marks, abrasions and bruising, including a bruise on [M.E.'s] throat which looks like a hand[,] and a black eye, all at different times." Appellants' App. Vol. II p. 182. The bruises to M.E. occurred after the First Petition was adjudicated. Moreover, after the First Petition was adjudicated, Mother filed a petition for a protection order and alleged serious and disturbing abuse by Father; Mother was arrested for domestic violence and battery; and Father was accused of pointing a gun at and harassing another man. Despite evidence of these events, Parents have refused to participate in domestic violence services. Although Parents denied many of these events, the trial court did not find Parents credible, and we cannot reweigh that determination.

[55] The CHINS statute does not require that a court "wait until a tragedy occurs to intervene." *Des.B.*, 2 N.E.3d at 838. A child cannot be returned to parents where there is continuing abuse and/or violence in the home. Given the significant evidence of domestic violence and other violence by Parents and their refusal to participate in domestic violence services in M.E.'s CHINS case, the trial court's finding that N.E. is seriously endangered is not clearly erroneous.

### B. Needs Unmet

[56] Father argues that DCS failed to demonstrate that N.E.'s needs were unmet. The trial court found that "[t]here is evidence that [N.E.'s] needs are not met and/or that the parents are not capable of meeting her needs." Appellants' App. Vol. II p. 185. In support of this finding, the trial court noted that the

following occurred after the First Petition was adjudicated: (1) Parents were evicted from their residence; (2) prior to the eviction, CASA observed that the residence was in deplorable condition and Parents refused to allow DCS to inspect the residence; (3) the trial court had concerns regarding Parents' ability to care for N.E.'s medical needs due to their repeated allegations of car problems; and (4) the trial court had concerns regarding drug abuse by Parents due to their repeated refusal to take drug screens.

[57] Father argued that he would secure new housing; it is speculative that Parents would be unable to transport N.E. to medical appointments; and "[t]he issue of substance abuse was settled in the previous appeal." Father's Br. p. 19. We disagree that the issue of substance abuse was "settled" in the previous appeal. Rather, concerns of Parents' substance abuse persisted after the adjudication of the First Petition due to their refusal to submit to drug screens in M.E.'s CHINS case, Father smelling of marijuana at visitations with the children, and Parents' behaviors. Parents' lack of housing also raises a significant concern regarding their capacity to meet N.E.'s needs. We conclude that evidence of Parents' conduct after the First Petition was adjudicated demonstrates that Parents are not capable of meeting N.E.'s needs, and the trial court's finding is not clearly erroneous.

### C. *Necessity of Coercive Intervention*

[58] Finally, Father challenges the trial court's finding that N.E.'s needs were unlikely to be met without the coercive intervention of the court. This "final element guards against unwarranted State interference in family life, reserving

that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *S.D.,* 2 N.E.3d at 1287 (quoting *Lake Cnty. Div. of Family & Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)).

[59]   The trial court found "[t]here is abundant evidence that [N.E.'s] needs cannot be met by the parents without S[t]ate coercion." Appellants' App. Vol. II p. 187. The trial court noted that Parents refused to participate in domestic violence services; refused to submit to random drug screens despite multiple court orders; refused to communicate with DCS except by email; and refused to allow DCS to inspect their residence. The trial court, thus, concluded: "There is a preponderance of evidence that [N.E.'s] needs cannot be met by the parents without State coercion as the parents have proven that by their past actions, by their refusal to participate in services and denial that they require services, and by testifying during the fact finding hearing that they will not participate without a Court Order." *Id.* at 188.

[60]   Father argues that the trial court placed the burden on Parents to "disprove" allegations by DCS by forcing them to show participation in domestic violence programs and forcing them to submit to drug screens. Father's Br. p. 20. To the contrary, DCS demonstrated Parents' persistent and adamant refusal to participate in services except for supervised visits with the children despite Parents' clear need for such services. Even during the fact-finding hearing, Mother stated that she does not feel like she needs DCS services and she does her "own therapy." Tr. Vol. II p. 105. The trial court's finding that N.E.'s

needs are unlikely to be met without the coercive intervention of the court is not clearly erroneous. Accordingly, we conclude that the trial court's grant of the Second Petition is not clearly erroneous.

## V. Contempt Finding

Next, Father argues that the trial court erred by finding him in contempt. Mother does not challenge the contempt finding on appeal. Father, however, argues that: (1) the trial court failed to follow the procedures outlined in Indiana Code Section 34-47-3-5 for indirect contempt; (2) Parents were held in contempt without prior notification or the opportunity to be heard; (3) the trial court relied upon information from the testing facility collected by its court reporter; and (4) Parents were not afforded a meaningful way to purge the contempt. DCS, however, argues that the contempt finding involved both direct and indirect contempt; the lack of strict compliance with the indirect contempt statute is excused; Father failed to object to the trial court's reliance upon the court reporter's unsworn statement; and Parents were given the opportunity to purge themselves of contempt.

"Trial courts maintain considerable discretion in determining whether a party should be found in contempt of court," and these determinations are reviewed for an abuse of discretion." *In re Paternity of B.Y.*, 159 N.E.3d 575, 577 (Ind. Ct. App. 2020). Our court will reverse a finding of contempt only if there is no evidence or inferences drawn therefrom that support it. *Id.*

"Contempt of court generally involves disobedience of a court or court order that 'undermines the court's authority, justice, and dignity.'" *Reynolds v. Reynolds*, 64 N.E.3d 829, 832 (Ind. 2016) (quoting *In re A.S.*, 9 N.E.3d 129, 131 (Ind. 2014)). There are two kinds of contempt: direct contempt and indirect contempt. *Id.* "Indirect contempt involves those acts committed outside the presence of the court which nevertheless tend to interrupt, obstruct, embarrass or prevent the due administration of justice." *Id.* (internal quotations omitted). Direct contempt involves "acts which are committed in the presence of the court or in such close proximity to it so as to disrupt its proceedings while in session." *A.S.*, 9 N.E.3d at 132.

The trial court here found Father in contempt for two reasons—his failure to appear at the May 10, 2023 review hearing and his failure to submit a hair follicle drug test despite multiple court orders to do so. DCS argues that the failure to attend a hearing amounts to direct contempt. We have held, however, that "a litigant's failure to appear at a hearing (as opposed to an attorney's failure to appear) constitutes **indirect contempt** that requires compliance with the procedural protections now found in Section 35-47-3-5, not direct contempt." *In re Paternity of J.T.I.*, 875 N.E.2d 447, 452 n.5 (Ind. Ct. App. 2007) (emphasis added); *see also Rice v. State*, 874 N.E.2d 988, 991 (Ind. Ct. App. 2007) (holding that, although an attorney can be found in direct contempt for failure to appear for a scheduled court hearing, a layperson litigant cannot be held in direct contempt for failure to appear); *cf. Bellamy v. State*, 952 N.E.2d 263 (Ind. Ct. App. 2011) (holding that, although the defendant was a layperson,

the trial court's finding that the defendant was in direct contempt for failure to appear was not an abuse of discretion where the defendant had been expressly warned that any subsequent failure to timely appear would result in a contempt finding), *trans. denied*. Accordingly, Father's failure to appear at the review hearing does not constitute direct contempt, and we must determine whether the proper indirect contempt procedures were followed to find Father in contempt for his failure to appear at the review hearing and failure to obtain the hair follicle test.

[65] Indiana Code Chapter 34-47-3 governs indirect contempt and provides several bases for a contempt finding. *See, e.g.*, Ind. Code § 34-47-3-2 ("A person who willfully resists, hinders, or delays the execution of any lawful process, or order of any court of record is guilty of an indirect contempt of court."). Father does not dispute that he willfully resisted a court order. Rather, Father first argues that he did not receive "prior notification or opportunity to be heard" as required by Indiana Code Section 34-47-3-5. Father's Appellant's Br. p. 28.

[66] Indiana Code Section 34-47-3-5 provides the procedures to follow in cases of indirect contempt as follows:

> (a) In all cases of indirect contempts, the person charged with indirect contempt is entitled:
>
> > (1) before answering the charge; or
> >
> > (2) being punished for the contempt;

to be served with a rule of the court against which the contempt was alleged to have been committed.

(b) The rule to show cause must:

(1) clearly and distinctly set forth the facts that are alleged to constitute the contempt;

(2) specify the time and place of the facts with reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against the defendant; and

(3) specify a time and place at which the defendant is required to show cause, in the court, why the defendant should not be attached and punished for such contempt.

(c) The court shall, on proper showing, extend the time provided under subsection (b)(3) to give the defendant a reasonable and just opportunity to be purged of the contempt.

(d) A rule provided for under subsection (b) may not issue until the facts alleged to constitute the contempt have been:

(1) brought to the knowledge of the court by an information; and

(2) duly verified by the oath of affirmation of some officers of the court or other responsible person.

Further, Indiana Code Section 34-47-3-6(c) provides that, if the defendant appears at the rule to show cause hearing, and:

> If the defendant's answer to the rule does not sufficiently deny, explain, or avoid the facts set forth in the rule, so as to show that no contempt has been committed, the court may proceed to attach and punish the defendant for the contempt, by:
>
> (1) fine;
>
> (2) imprisonment; or
>
> (3) both fine and imprisonment.

[67] The statute, thus, requires the service of a rule to show cause on the defendant. The rule to show cause must specify the allegations against the defendant and set the matter for a hearing where the defendant must demonstrate why he should not be "attached and punished for such contempt." Ind. Code § 34-47-3-5(b)(3). If the trial court finds the defendant in contempt, the trial court may then "attach and punish the defendant for the contempt." I.C. § 34-47-3-6(c).

[68] The trial court here did not follow the procedures set forth in Indiana Code Chapter 34-47-3. The trial court stated at the May 10th hearing that it was setting the contempt matter for hearing. The May 11th order, however, stated: "The Court hereby **holds [Parents] in contempt** for violating Court Orders dated February 2nd and 27, 2023, instructing them to take hair follicle drug tests and for failing to appear for the hearing scheduled for May 10, 2023 . . . ." Appellants' Amended Consol. Suppl. App. Vol. II p. 14 (emphasis added). The order then provided that the May 31st hearing was to impose sanctions.

[69] At the rescheduled June 7th hearing, the trial court stated that the hearing was a "**rule to show cause**" hearing. Tr. Vol. VI p. 105 (emphasis added). Parents were then allowed to testify regarding their failure to appear at the May 10th hearing and their failure to comply with multiple orders to obtain the hair follicle drug testing. Also during the hearing, the trial court stated: "So, court **having already found them in contempt** they are found in contempt for their failure to appear at the review hearing on May tenth (10th)." *Id.* at 117 (emphasis added). The trial court's order then stated: "**In the May 11th Order, this Court found the parties in contempt** for failing to appear at the May 10th hearing and for violating the Court Orders instructing them to take hair follicle drug screens." Appellants' Amended Consol. Suppl. App. Vol. II p. 18 (emphasis added).

[70] Although under Indiana Code Chapter 34-47-3 the trial court should have issued a rule to show cause and set the matter for hearing to determine whether Parents were in contempt, the trial court appears to have found Parents in contempt and then held a rule to show cause hearing to impose sanctions. "Generally, a court's authority to find a person in contempt rests on whether a trial court has strictly complied with the statutory requirements set forth in the rule to show cause statute."[11] *Reynolds*, 64 N.E.3d at 833. Because the trial

---

[11] Our Supreme Court has noted that strict compliance with the statute may be excused if "it is clear the alleged contemnor nevertheless had clear notice of the accusations against him or her." *Reynolds*, 64 N.E.3d at 833. "Examples of this 'clear notice' exception include when a contemnor receives a copy of an original contempt information that contains detailed factual allegations of contempt or if the contemnor admits the

court did not issue a rule to show cause prior to finding Parents in contempt, we conclude that the trial court erred by failing to follow the statutory procedures.

[71] Father also argues that the trial court erred by relying upon information obtained from the testing facility by its court reporter. During the rule to show cause hearing, the trial court stated: "[P]rior to this hearing starting I had my court reporter call Right Choice D.A.T. to see if either party had taken a test or appeared and the response was no [Parents] had not appeared to take a test." Tr. Vol. VI p. 117. In its order from the June 7th hearing, the trial court found: "Just minutes prior to the hearing on June 7, 2023, the Court Reporter contacted Right Choice DAT to see if the parties had appeared for a drug test and they had not." Appellants' Amended Consol. Suppl. App. Vol. II p. 118. Father contends that, because the court reporter did not testify, the court reporter was not subject to cross-examination. Father, however, did not object at the hearing to the trial court relying upon the information obtained by the court reporter.

[72] The failure to object to the trial court "normally results in waiver and precludes appellate review." *Des.B.*, 2 N.E.3d at 834. Waiver notwithstanding, we agree that the trial court abused its discretion by using this procedure. "At all times the trial court must maintain an impartial manner and refrain from acting as an

---

factual basis for a contempt finding." *Id.* (quoting *J.T.I.*, 875 N.E.2d at 451). Because the trial court here did not issue a rule to show cause before finding Parents in contempt, we conclude that strict compliance with the statute is not excused.

advocate for either party. A violation of due process occurs where a trial judge combines the roles of judge and advocate." *Chappey v. Storey*, 204 N.E.3d 932, 939 (Ind. Ct. App. 2023) (internal quotes omitted), *trans. denied*. The evidence from the court reporter was obtained at the trial court's request, and the court reporter did not testify under oath and was not subject to cross-examination. Because Parents were not given the opportunity to cross-examine this evidence, which the trial court sua sponte considered, we conclude that the trial court erred by considering this evidence.

[73] Finally, Father argues that Parents were not given the opportunity to purge the contempt. "[T]he 'purge' portion of [Indiana Code Section 34-47-3-5 ] has typically only applied to cases where the trial court has ordered jail time to coerce action by the contemnor." *Reynolds*, 64 N.E.3d at 835. A jail sentence for civil contempt must be coercive or remedial rather than punitive in nature. *In re Paternity of C.N.S.*, 901 N.E.2d 1102, 1106 (Ind. Ct. App. 2009). "To avoid being purely punitive, a contempt order must offer an opportunity for the recalcitrant party to purge himself or herself of the contempt." *Id.* The trial court's order here, however, did include provisions for Father to purge himself of the contempt. The order provided that the contempt could be purged if Parents submitted to either a nail bed or body hair twelve-panel drug test and participate in other services. *See* Appellants' Amended Consol. Suppl. App. Vol. II p. 20.

[74] Although Father was given the opportunity to purge himself of contempt, the procedure used by the trial court did not comply with the statutory

requirements. Further, the trial court abused its discretion by considering evidence obtained by the court reporter. Accordingly, we conclude that the trial court erred by finding Father in contempt.

## Conclusion

[75] We conclude that the Second Petition was not barred by res judicata; Mother's due process rights were not violated; Parents have failed to establish an abuse of discretion in the admission of evidence at the fact-finding hearing; and the trial court's grant of the Second Petition was not clearly erroneous. The trial court, however, abused its discretion by finding Father in contempt because the trial court failed to follow the statutory procedures and considered improper evidence. Accordingly, we affirm in part and reverse in part.

[76] Affirmed in part and reversed in part.

Pyle, J., and Foley, J., concur.